**MARITRANS INC., Maritrans General Partner Inc., Maritrans Operating Partners L.P., and Maritrans Capital Corporation, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 96–483 C.**

United States Court of Federal Claims.

March 11, 1999.

---

Laurie A. Frost, Alexandria, Virginia, and Stephen A. Saltzburg, Washington D.C., for plaintiffs.

Lauren S. Moore, United States Department of Justice, Washington, D.C., for defendant.

**OPINION AND ORDER**

HODGES, Judge.

## I. Introduction

We ruled in April that plaintiffs possess property rights in their tankers, disposing of defendant's argument that plaintiffs could not have such rights for Fifth Amendment purposes because the tankers were subject to heavy federal regulation. We also ruled against defendant in its attempt to establish that the property is not entitled to Fifth Amendment protection because it is not real property. Although personal property may not always be entitled to the same protections, we could not preclude the possibility of finding a taking based on the facts presented. The Supreme Court has directed that we decide each case on an *ad-hoc*, fact specific basis.

Now we consider whether a trial is necessary to gauge economic impact and to decide whether a taking occurred. For reasons stated below, we must rule that such a trial is not appropriate at this time.

## II. Discussion

### A. Reasonable Investment– Backed Expectations

 "A 'reasonable investment-backed expectation' must be more than 'a unilateral expectation or an abstract need.'" *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1177 (Fed.Cir.1994) (quoting *Ruckelshaus v. Monsanto Company*, 467 U.S. 986, 1005–6, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (quoting *Webb's Fabulous Pharmacies v. Beckwith*, 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980))). "One who buys with knowledge of a restraint assumes the risk of economic loss." *Creppel v. United States*, 41 F.3d 627, 632 (Fed.Cir.1994) (citing *Concrete Pipe & Prods. of California, Inc. v. Construction Laborers Pension Trust for S.Cal.*, 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993)). "In such a case, the owner presumably paid a discounted price for the property. Compensating him for a 'taking' would confer a windfall." *Id.* As the court in *Loveladies Harbor, Inc.* noted:

In legal terms, the owner who bought with knowledge of the restraint could be said to

have no reliance interest, or to have assumed the risk of any economic loss. In economic terms, it could be said that the market had already discounted for the restraint, so that a purchaser could not show a loss in his investment attributable to it. *Loveladies Harbor, Inc.*, 28 F.3d at 1177. Plaintiffs must show that they took an interest in the property "in reliance on a state of affairs that did not include the challenged regulatory regime." *Id.*

Defendant argues that any investment-backed expectations on plaintiffs' part were unreasonable, given the extensive amount of regulation in the shipping industry. Defendant offers cases that it believes suggest that a high degree of regulation may defeat a takings claim. *See, e.g., Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 227, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); *Ruckelshaus v. Monsanto Company*, 467 U.S. 986, 1013, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). The focus here is on the reasonableness of the investment-backed expectation in light of the presence of regulation.

We determined at trial that plaintiffs reasonably dismissed the notion that double hulls would be required during the vessels' working lives. They had more than a unilateral expectation or an abstract need. Maritrans did not buy with knowledge of the restraint, and cannot be said to have assumed the risk of economic loss. Plaintiffs did not have prior actual or constructive notice of the double-hull requirement. Plaintiffs voluntarily operate in a regulated industry, but that is not dispositive of an *ad hoc* takings analysis. The Supreme Court "has generally been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action must be deemed a compensable taking." *Ruckelshaus*, 467 U.S. at 1005, 104 S.Ct. 2862 (citing *Penn Central Transportation Company v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)). The inquiry is of necessity an "ad hoc, factual" inquiry. *Id.*

A National Academy of Sciences study completed in 1981 effectively ended discussion of a double-hull requirement. The Coast Guard's proposal to require retrofitting of all vessels with double hulls was withdrawn in 1982. After that, plaintiffs had no reliable indication from Congress, industry publications, competitors, or any public materials that such a requirement would be considered seriously. Plaintiffs had no reason to anticipate a double-hull requirement during the useful life of their fleet. Admiral Joel Sipes testified for plaintiffs as an expert:

Q: When you took over in 1988, if the industry had come to you and said, "We are going to [do] a deal like Maritrans just did. What we want to know is, is there any danger of a double hull requirement . . . ?"

A: I would not have proposed that the hull requirement would be invoked. The answer is no.

Dr. Henry Marcus testified for defendant as an expert. He is Chairman of the Ocean Systems Management Group, and the Naval Sea Systems Command professor at MIT:

Q: Is it not also true that not a single one of your colleagues ever wrote an article predicting that between the National Academy of Sciences report being issued and the end of 1987 that there would ever be a retroactive application of a double hull requirement to tank barges?

A: I really don't know.

Q: How many articles are you aware of predicting that there would be a retroactive double hull requirement that would publish after the National Academy of Sciences Report at the end of 1987?

A: I assume there's discussion on such things, but I am unaware of any articles that meet your requirements.

Q: No articles. Any books?

A: Not that I know of.

Further:

Q: Between 1981 and 1987, are you aware of anybody in the maritime industry who predicted retroactive application of a double hull requirement?

A: No. There are a number of people who built double hull tank vessels for whatever reason. I'm not aware of anyone who specifically predicted double hull rules.

David St. Amand was an expert witness for the Government. He also testified that he was not aware of any articles published between 1981 and 1987 that criticized the National Academy of Sciences study or suggested that double hulls deserved a second look. Steven Van Dyck is CEO and Chairman of the Board for Maritrans. He testified for plaintiff:

Q: What was your understanding after 1982 about the proposal that had been suggested for requiring that tank barges that were in existence be retrofitted with double hulls?

A: Well, my understanding was it was dead ... I thought it was dead.

The Coast Guard apparently continued to maintain its view that double hulls would be beneficial. Some evidence was presented that could be used to assert that double hulls were on the horizon. For example, the testimony of Daniel Sheehan pointed to maritime history and other evidence that might, under certain circumstances, suggest the possibility of a "retroactive" double hull requirement. However, these loosely connected considerations did not put the industry on notice of such a requirement. We apply a standard of reasonableness.

Almost without exception, officials within the Coast Guard, the Maritime Administration, the academic community and the entire maritime industry did not foresee the advent of double hulls. No such plan was afoot in Congress, in the Executive Branch, or even within environmental groups during the period when Maritrans acquired the vessels. Maritrans engaged in a public offering and received loans during the period before 1990. No investment company, underwriter, lender, or accounting or law firm responsible for assessing Maritrans' risk during this period could foresee the advent of double hulls. Considerable expertise was brought to bear, none of the experts predicted double hulls.

Acting years later with the benefit of hindsight, this court cannot consider itself to be in a better position to find predictability than experts acting at the time investment decisions had to be made, based on information contemporaneously available. The Government's argument seems to be that because the shipping or maritime industry had been regulated in the past, more regulations should be expected—even if different from those enacted in the past. This argument essentially urges us to bar a claim because OPA 90 theoretically was predictable. The standard we apply, however, is whether OPA 90 was reasonably foreseeable. It was not. When plaintiff built or acquired the vessels at issue, it could not reasonably have anticipated that double hulls would be required during the estimated working lifetime of the vessels.

B.   Character of the Governmental Action

■   The Government argues that Maritrans is not entitled to compensation for less than a total loss of its property, and that it has not suffered such a loss. According to defendant, the Supreme Court has "forcefully adopted an 'all or nothing' rule for categorical or *per se* takings." *See, e.g., Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1019 n. 8, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). We have no particular quarrel with this argument, but here, a different type of taking may have occurred. Defendant also asserts that "a mere diminution in value or reduction in attractiveness to potential purchasers is not enough to justify compensation for a facial taking."[1] A taking may nevertheless exist.

The Federal Circuit has ruled that a finding that the economic impact of a regulation is nothing more than a "mere diminution" does not dispense with the need to examine the other *Penn Central* factors. *See Broadwater Farms Joint Venture v. United States,* 121 F.3d 727 (table), 1997 WL 428516, at *3 (Fed.Cir.1997). The Federal Circuit held:

The trial court found that the economic impact felt by [plaintiff] was insignificant. However, the Court did not make any findings on the second or third Florida Rock factors. Without the benefit of these findings, this court cannot properly balance the economic impact of the regulation against its interference with [plaintiff's] in-

---

**1.** Defendant cites *Esposito v. South Carolina Coastal Council,* 939 F.2d 165 (4th Cir.1991), *cert. denied,* 505 U.S. 1219, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992) for this proposition.

vestment-backed expectations and the propriety of the Government's actions.

*Id.* The Federal Circuit also determined that "the trial court will also have the opportunity to balance these findings with its assessment of the economic impact of the regulation to determine whether (plaintiff) is entitled to compensation under a partial regulatory taking analysis." *Id.*

The Circuit has not explained how the three factors should be balanced, or whether all of the prongs must be examined in every case. For instance, a finding of no economic impact should dispense with the need to consider other matters. We have examined the reasonable investment-backed expectations prong and to some degree the nature of the governmental action, but it is not clear whether a full-scale examination of economic impact—meaning a trial on the issue—is warranted. If the reasonable investment-backed expectations prong leans toward plaintiff and the character of governmental action prong benefits defendant, the economic impact prong may be the decisive issue.

There may be some overlapping of the considerations that apply under each prong. The *Penn Central* prongs cannot be applied to each and every case without some degree of artificiality. Here, that means defendant's argument that "mere enactment of OPA 90 did not constitute a taking" under the character of the governmental action prong cannot be divorced completely from the economic impact prong. A fact critical to one inquiry may be important or even dispositive of another. In this case, the undisputed fact that most of Maritrans' vessels are still in use is relevant not only to character of government action but also to economic impact.

### C. Economic Impact

The law that plaintiffs' claim effects a taking has not yet taken effect; it does not impede plaintiff's use of the vessels in any way. Maritrans may make full and unimpeded use of its vessels today,[2] and will be able to do so for some years into the future. Plaintiff's contention is that the Government has, by legislative fiat, severed the economic stream associated with the vessels at the point of retirement of each vessel—an immediate economic detriment to plaintiff. Plaintiff asserts that the adverse economic effect of OPA 90 was "felt immediately." The question before us is whether a taking has occurred in such circumstances. We must find that it has not.

*Lucas* determined that when all economically beneficial use of property is prohibited, a categorical or *per se* taking may be the result. *See Lucas,* 505 U.S. at 1029, 112 S.Ct. 2886. When less than all economically viable use of property is taken, perhaps a taking that is other than a "categorical" one has occurred. Few cases hold a taking when the value of the property is insignificantly affected; *i.e.,* when there is a "mere diminution in value." Recently, it has been urged to this court in an unrelated proceeding that there may not be *any* case where a regulatory taking was found despite a determination that the property as a whole retained economically viable use.

We recognize tension in this area. The Federal Circuit has noted, for example:

> Logically, the amount of just compensation should be proportional to the value of the interest taken as compared to the total value of the property, up to and including total deprivation, whether the taking is by physical occupation for the public to use as a park, or by regulatory imposition....

*Florida Rock Indus. v. United States,* 18 F.3d 1560, 1569 (Fed.Cir.1994), *cert. denied,* 513 U.S. 1109, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995) (Florida Rock IV). This proposition is logical. Whether it is the law is a more difficult question. As the Supreme Court stated in *Lucas,*

> It is true that in at least *some* cases the landowner with 95% loss will get nothing, while the landowner with total loss will recover in full. But that occasional result is no more strange than the gross disparity between the landowner whose premises are taken for a highway (who recovers in full) and the landowner whose property is reduced to 5% of its former value by the highway (who recovers nothing). Takings

---

**2.** Two vessels have been "scrapped" by Maritrans, a fact which does not change our analysis.

law is full of these "all or nothing" situations.

*Lucas,* 505 U.S. at 1019 n. 8, 112 S.Ct. 2886. From the above, we might divine that there is no "right to value," *per se.* A Governmental action must do more than affect value detrimentally. In other words, if Maritrans felt an immediate impact (via the supposed reduction in value of its vessels), this may be akin more to feeling a reduction in value due to neighboring highway construction than to having one's property taken for a highway. The latter might be analogized to having the use of one's vessels prohibited completely.

Mere passage of OPA 90 did not result in a taking. Case law establishes that passage of an act may have an economic impact without necessarily effecting a taking. The Fifth Amendment offers compensation for takings that already have occurred. Once OPA 90 has retired certain vessels in Maritrans' fleet, compensation might be due. The economic loss arguably suffered by Maritrans is the result of markedly decreased expectations concerning the vessels' value through their ability to generate revenue. The loss is not the result of a taking, which admittedly may yet occur. Because this loss is not the result of a taking which has already occurred, it does not mandate the payment of just compensation.

The Federal Circuit remanded *Broadwater Farms* to balance mere diminution in value against the nature of the governmental action and the plaintiff's reasonable investment-backed expectations. That Court might be considering the possibility that a mere diminution in value could be offset by particularly egregious government actions or particularly strong investment-backed expectations, or the Circuit may want to lower the all "economically viable use" threshold. It is worth noting, however, that before *Lucas* created an additional per se taking category, *Penn Central* suggested that economic damage should be significant before a taking is found:

> (A)ppellants concede that the decisions sustaining other land-use regulations, which, like the New York City law, are reasonably related to the promotion of the general welfare, uniformly reject the prop-

osition that diminution in property value, standing alone, can establish a 'taking' . . .

*Penn Central Transportation Company v. City of New York,* 438 U.S. 104, 131, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Here, the only injury suffered by plaintiffs so far is diminution in value, standing alone. If the law ever takes effect, it could interfere with reasonable investment-backed expectations and could be held to merit compensation, but at this point the most plaintiffs could show at trial would be a reduction in the value of the vessels, not the ability to use them. The character of the government action cannot be challenged because the only action the Government has undertaken so far is passing a law.

The Fifth Amendment does not mandate compensation for takings that are scheduled to take place in the future. To the extent that Maritrans' vessels are less valuable today than they were before the passage of OPA 90, it is the result of frustration of the economic prospects of the vessels. The issue remains as described:

> Nothing in the Fifth Amendment limits its protection to only 'categorical' regulatory takings, nor has the Supreme Court or this court so held. Thus there remains in cases such as this the difficult task of resolving when a partial loss of economic use of the property has crossed the line from a noncompensable 'mere diminution' to a compensable 'partial taking.'

*Florida Rock Indus.,* 18 F.3d at 1570. Here we must find that the plaintiffs fall on the noncompensable side of the line. We cannot find a partial taking because nothing has been taken yet. Only economic value, not economically viable use, has been taken. This distinction is not necessarily a comfortable one.

We see no reason to hold a trial on the economic impact of the regulation at issue with respect to nearly 40 separate vessels when none of the vessels has been retired. Judicial resources will be preserved by dismissing this case.

### III. Conclusion

This case presents the question, assuming that a law effects a taking, does it cause a

taking when it passes or when it takes effect. We believe that a trial on potential value of plaintiffs' tankers at the time they must be removed from the fleet or retrofitted, would be speculative and nonproductive. For that reason, we must direct the Clerk to dismiss plaintiffs' complaint as untimely. No costs.

