**MARITRANS INC., Maritrans General Partner Inc., Maritrans Operating Partners L.P., and Maritrans Capital Corporation, Plaintiffs–Appellants,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 02–5083.

United States Court of Appeals, Federal Circuit.

DECIDED: Sept. 9, 2003.

Stephen A. Saltzburg, George Washington University National Law Center, of Washington, DC, argued for plaintiffs-appellants. With him on the brief was Laurie Frost Wilson, Attorney at Law, of Lorton, Virginia. Of counsel on the brief was Arthur J. Volkle, Jr., Legal Counsel, Maritrans Inc., of Tampa, Florida.

Scott R. McIntosh, Attorney, Appellate Staff, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Douglas N. Letter, Appellate Staff; and William Olivier and Lauren Moore, Attorneys, Commercial Litigation Branch.

Before SCHALL, BRYSON, and LINN, Circuit Judges.

SCHALL, Circuit Judge.

Maritrans Inc. is a marine petroleum transport company. Maritrans Inc., along with Maritrans General Partner Inc., Maritrans Operating Partners L.P., and Maritrans Capital Corporation (collectively "Maritrans"), filed suit in the United States Court of Federal Claims seeking compensation from the United States ("government") under the Fifth Amendment for the alleged taking of thirty-seven of Maritrans' single hull tank vessels.[1] Maritrans asserted that the vessels were taken by the double hull requirement imposed by section 4115 of the Oil Pollution

---

1. Maritrans Inc. is the parent corporation of Maritrans General Partner Inc., Maritrans Operating Partners L.P., and Maritrans Capital Corporation. Maritrans General Partner Inc. is the corporate general partner of Maritrans Operating Partners L.P., which is the owner and operator of appellants' vessels. Maritrans Capital Corporation is a party to the Indenture of Trust and Security Agreement, dated March 15, 1987, covering the mortgages on appellants' vessels. As the parties have done, in the interest of clarity, we refer to the collective entity "Maritrans" as the owner and operator of the vessels at issue in this case.

Act of 1990 ("OPA90"), Pub.L. No. 101–380, § 4115, 104 Stat. 484 (1990) (codified at 46 U.S.C.App. § 3703a).[2] The Court of Federal Claims concluded that, as far as twenty-nine of the single hull tank vessels were concerned, Maritrans' takings claim was not ripe for adjudication. *Maritrans, Inc. v. United States*, 43 Fed.Cl. 86, 92 (1999). As far as the remaining eight vessels were concerned, the court concluded that the claim was ripe. *Maritrans Inc. v. United States*, No. 96–483 C (Fed.Cl. Apr. 30, 1999). Following a trial on the merits, however, it held that OPA90 had not resulted in either a categorical or a regulatory taking of those vessels. *Maritrans Inc. v. United States*, 51 Fed.Cl. 277, 283 (2001). It therefore dismissed the complaint. *Id.* Maritrans now appeals. We affirm the decision of the Court of Federal Claims that eight of Maritrans' vessels were not taken by the government as a result of the enactment of OPA90. However, we reverse the decision of the court on the ripeness issue insofar as it relates to the seven remaining vessels covered by Maritrans' claim.[3] To that limited extent, the case is remanded for further proceedings.

## BACKGROUND

### I. OPA90

■ Maritrans was formed in 1987 to acquire the tugboat and tank barge fleet and related assets of Sonat Marine Inc. Since acquiring its fleet of tank vessels, Maritrans has established itself as a ma-

rine petroleum transport company that transports, stores, and distributes oil for petroleum companies and distributors. It operates its fleet of tank barges in the United States coastwise Jones Act trade, transporting over 200 million barrels of crude oil and refined petroleum products annually.[4]

In 1990, Congress passed OPA90, in response to the massive March 1989 *Exxon Valdez* oil spill in Prince William Sound, Alaska. OPA90 requires that all newly constructed tank vessels engaged in marine transportation of oil and petroleum products in the United States be constructed with double hulls. 46 U.S.C.App. § 3703a(a) ("Except as otherwise provided in this section, a vessel to which this chapter applies shall be equipped with a double hull . . . ."). A double hull design provides a reinforced hull in order to minimize the impact of punctures and hull damage. OPA90 applies to a vessel if the vessel "is constructed or adapted to carry, or carries, oil in bulk as cargo or cargo residue" and when the vessel is "operating on the waters subject to the jurisdiction of the United States, including the Exclusive Economic Zone." *Id.* § 3703a(a)(1) & (2). OPA90 also requires that all single hull tank vessels, including tank barges, existing at the time of OPA90's enactment be retrofitted with double hulls in order to qualify for operation on the navigable waters of the United States or the waters of the Exclusive Economic Zone of the United States. *Id.* § 3703a(c). Any single hull

---

**2.** All references are to statutes as set forth in the 2000 version of the United States Code.

**3.** As noted, in its original complaint, Maritrans alleged that OPA90 resulted in a taking of thirty-seven of its vessels. Subsequently, however, it withdrew the claim with respect to twenty-two of the vessels.

**4.** In promulgating the Jones Act, Congress sought to protect American ships, American

shipbuilders, and American seamen from foreign competition. *See Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 574–75 & n. 1, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980). The Act requires that all vessels engaging in point-to-point shipping within the United States be built in the United States and be owned and operated by citizens of the United States. 46 U.S.C.App. § 883.

tank vessels not retrofitted in that manner must be phased out of service according to a retirement schedule, which began on January 1, 1995. *Id.* OPA90 specifies that no single hull tank vessel may be operated on the navigable waterways of the United States or the waters of the Exclusive Economic Zone after dates that are established on the basis of a vessel's size and age. *Id.* § 3703a(a)-(c).

OPA90 encompasses all single hull tank barges in operation in Jones Act trade, such as those owned by Maritrans. Approximately 90% of Maritrans' tank vessels are constructed with single hulls or double-bottom hulls and would be forced out of service if not retrofitted with double hulls by their assigned retirement dates. Since 1990, when OPA90 became effective, Maritrans has retrofitted two of its single hull tank barges with double hulls at a cost of approximately $14 million per barge. Maritrans also has sold five of its single hull tank barges for prices of $2.2 to $3.4 million per vessel. In addition, it has collected insurance proceeds from the casualty loss of one single hull tank barge that was involved in a collision in 1996. As will be seen, it was these eight vessels that were the subject of the Court of Federal Claims' takings analysis.

## II. Maritrans' Suit in the Court of Federal Claims

On August 7, 1996, Maritrans filed suit in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(a)(1). In its complaint, it alleged that it was entitled to compensation under the Fifth Amendment's Takings Clause for the taking of thirty-seven of its single hull tank barges. Maritrans asserted that OPA90's double hull requirement extinguished the useful working lives of the barges and deprived it of 100% of the economic value of the barges after their required retirement dates. Accordingly, Maritrans argued, the statute resulted in a categorical taking of the vessels. Maritrans also argued that the double hull requirement resulted in a regulatory taking of its vessels.[5]

In due course, the government moved to dismiss Maritrans' complaint pursuant to Rule 12(b)(4) of the Rules of the Court of Federal Claims for failure to state a cause of action for which relief could be granted. The government asserted that Maritrans had no Fifth Amendment property interest for which it could assert a takings claim. Specifically, the government argued that Maritrans operated its tank barge fleet in a highly regulated field and therefore could have no property interest in the vessels in the fleet. The government pointed to a 1980 proposal by the United States Coast Guard recommending the adoption of a double hull requirement for all vessels to suggest that the field was highly regulated. The government further argued that personal property, such as a single hull tank barge, does not enjoy the same scope of constitutional protection as real property. The court disagreed, concluding that Maritrans had a property interest in its vessels that was cognizable under the Fifth Amendment and that Maritrans had stated a cause of action for which relief could be granted. *Maritrans Inc. v. United States,* 40 Fed.Cl. 790, 801 (1998).

On July 15–17, 1997, the Court of Federal Claims held a trial on the issue of whether Maritrans could establish that its property had been the subject of a regulatory taking under the analysis set forth in *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The *Penn Central* analysis focuses on three factors, the char-

---

**5.** At the time OPA90 was enacted, four of Maritrans' tank barges had double hulls. Maritrans did not assert that there had been a taking of those vessels.

acter of the governmental action at issue, the economic impact of the action on the claimant, and the extent to which the action has interfered with the claimant's distinct, investment-backed expectations. *Id.* at 124, 98 S.Ct. 2646. The court concluded that OPA90 had interfered with a reasonable, investment-backed expectation on the part of Maritrans, because, when the tank barges were acquired, Maritrans could not have foreseen that double hulls would be required during the estimated working life of the barges. *Maritrans,* 43 Fed.Cl. at 89. Nevertheless, the court dismissed Maritrans' suit as not ripe for adjudication. *Id.* at 92. It did so because it concluded that, at that time, a taking had not yet occurred. *Id.* It reached that conclusion because none of Maritrans' vessels had been retrofitted, scrapped, or sold by reason of OPA90. *Id.* Maritrans moved for reconsideration of the dismissal, arguing that ten of its tank barges had been retrofitted, scrapped, or sold as a result of the statute. In response, the court agreed to consider Maritrans' takings claim on the merits insofar as it related to eight barges that had either been retrofitted with a double hull, scrapped as a result of a casualty, or sold on account of OPA90. *See Maritrans,* 51 Fed.Cl. at 279. Those eight vessels were the Ocean 90, the Ocean 96, the Ocean 115, the Ocean 135, and the Ocean 155 (each sold); the Ocean 192 and the Ocean 244 (each retrofitted with a double hull); and the Ocean 255 (a casualty loss). It determined, however, that the ripeness requirement was not met with respect to the remaining twenty-nine barges that were named in Maritrans' complaint. Subsequently, Maritrans withdrew its takings claim with respect to 22 of the smaller barges in its fleet, thereby limiting its claim to the eight barges identified and seven additional barges for which the court had held Maritrans' takings claim was not ripe. Those additional seven barges were the Ocean 193, the Ocean 210, the Ocean 211, the Ocean 215, the Ocean 250, the Ocean Cities, and the Ocean States.

In January of 2001, the Court of Federal Claims held a trial to assess the economic impact on Maritrans of the double hull requirement of OPA90. Based upon the evidence adduced at trial, the court determined that OPA90, when considered throughout the period of Maritrans' ownership of the eight tank barges at issue, had reduced Maritrans' profits arising from the barges, but had not deprived Maritrans of all economically beneficial uses of the barges. *Maritrans,* 51 Fed.Cl. at 281. The court relied on the following facts: that Maritrans had received fair market value for the barges that it had sold; that it could continue to use and derive benefit from the barges that had been retrofitted; and that it had received insurance proceeds for the barge that had been scrapped after the 1996 collision. *Id.* Accordingly, the court concluded that there had not been a categorical taking of the barges. *Id.* The court also concluded that there had not been a regulatory taking of the barges. *Id.* at 283. The court reached that conclusion after finding that, even after OPA90, the barges retained substantial economic value and several beneficial uses for Maritrans; that OPA90 was enacted to further a permissible goal that benefited the public (the reduction of oil spills); and that Maritrans alone was not required to bear the burden of the double hull requirement. *Id.* at 282. This appeal by Maritrans followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## ANALYSIS

### I. Standard of Review

 Whether a compensable taking has occurred is a question of law based on factual underpinnings. *Wyatt v. United*

*States,* 271 F.3d 1090, 1096 (Fed.Cir.2001). In reviewing a final decision of the Court of Federal Claims after a trial, we review legal conclusions *de novo,* and we review factual findings under the "clearly erroneous" standard. *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1379 (Fed. Cir.2001). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

## II. Fifth Amendment Takings

■ The Fifth Amendment provides, in pertinent part, as follows: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V, cl. 4. The language of this clause does not prohibit the government from taking private property altogether; rather, it prohibits the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Cent.,* 438 U.S. at 123, 98 S.Ct. 2646 (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)).

■ While a taking often occurs as a result of a physical invasion or confiscation, the Supreme Court has long recognized that "if regulation goes too far it will be recognized as a taking." *Pa. Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Real property, *see Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), tangible property, *see Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), and intangible property, *see Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1003–04, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), all may be the subject of takings claims.

■ The Federal Circuit has developed a two-part test to evaluate claims that a governmental action constitutes a taking of private property without just compensation. *See M & J Coal Co. v. United States,* 47 F.3d 1148, 1153–54 (Fed.Cir. 1995). First, a court must evaluate whether the claimant has established a "property interest" for purposes of the Fifth Amendment. *Id.* at 1154. Second, once a court has determined that a property interest exists, it must determine whether a taking occurred. *Id.* In that regard, we have stated that "it is often important to determine at the outset whether a particular claimed taking was 'categorical' or not." *Rith Energy, Inc. v. United States,* 247 F.3d 1355, 1362 (Fed.Cir.2001) (on rehearing).

■ A categorical taking has been defined as one in which "all economically viable use, i.e., all economic value has been taken by the regulatory imposition." *Palm Beach Isles Assocs. v. United States,* 231 F.3d 1354, 1357 (Fed.Cir.2000). A categorical taking is distinct from a taking "that is the consequence of a regulatory imposition that prohibits or restricts only some of the use that would otherwise be available to the property owner but leaves the property owner with substantial economic use." *Id.* When a taking is determined to be non-categorical, the court must embark on a fact-based inquiry in which it applies the standard promulgated by the Supreme Court in *Penn Central* to evaluate whether the governmental action at issue constituted a cognizable taking of the property interest at issue. *Rith Energy,* 247 F.3d at 1362. The *Penn Central* analysis involves "several factors that have particular significance." *Penn Cent.,* 438 U.S. at 124, 98 S.Ct. 2646. As noted above, those factors are the character of

the governmental action at issue, the economic impact of the action on the claimant, and the extent to which the action has interfered with the claimant's distinct, investment-backed expectations. *Id.* However, if a claimant fails to demonstrate that the interest allegedly taken constituted a property interest under the Fifth Amendment, a court need not even consider whether the government regulation was a taking under the analysis set forth in *Penn Central. M & J Coal,* 47 F.3d at 1154.

## A. Cognizable Property Interest

Maritrans asserts that the government, through its implementation of OPA90's double hull requirement, took "the expected useful lives and associated revenue streams" from each of its tank barges. Complaint ¶ 42. In other words, Maritrans argues that the government took its barges at the time OPA90 became effective. The government, however, contends that personal property is not entitled to the same protection under the Fifth Amendment as real property. According to the government, the concept of a categorical taking cannot be extended to regulations that restrict the use of personal property. The government further contends that, in any event, the use of single hull tank barges on the navigable waters of the United States increases the risk of oil spills and therefore is a nuisance not subject to Fifth Amendment protection. Finally, the government argues that the use the government has chosen to regulate and, therefore, the property interest asserted by Maritrans, is the use of the navigable waters of the United States by single hull tank vessels to transport oil. The government maintains that no individual or corporation has the right to use a public waterway, but may only do so at the discretion of the government.

The Court of Federal Claims concluded that Maritrans possessed a cognizable property interest in each of its single hull tank barges. *Maritrans,* 40 Fed.Cl. at 801. In reaching that conclusion, the court determined that the fact that Maritrans participates in the marine transport industry, which is highly regulated, does not preclude it from proving that a compensable taking has occurred. *Id.* at 800–01. The court also held that the operation of Maritrans' barges did not constitute a nuisance. *Id.* at 799.

■■■ The Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment. *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Instead, "existing rules and understandings" and "background principles" derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking. *Lucas,* 505 U.S. at 1030, 112 S.Ct. 2886. As an initial matter, we dispose of the government's arguments that personal property is not subject to Fifth Amendment protection and that Maritrans' use of its barges to transport oil constitutes a nuisance. As previously noted, tangible property may be the subject of a takings claim. *See Andrus,* 444 U.S. at 65, 100 S.Ct. 318. As far as the nuisance point is concerned, it is true that the Supreme Court has indicated that government regulation of a nuisance does not result in a taking. *Lucas,* 505 U.S. at 1022, 112 S.Ct. 2886 ("It is correct that many of our prior opinions have suggested that 'harmful or noxious uses' of property may be proscribed by government regulation without the requirement of compensation."). We agree with the Court of Federal Claims that Maritrans' use of its tank barges to transport oil does not, by itself, constitute a nuisance.

■■ We therefore turn to the government's argument that, since Maritrans uti-

lizes its single hull tank barges on the navigable waters of the United States, the property interest Maritrans asserts is the use of its vessels on such waterways, which it claims is not a protected property interest. The government asserts that such use does not amount to a cognizable property interest because the navigable waters of the United States are public property, in which Maritrans may not assert a property interest. *See Gilman v. Philadelphia,* 70 U.S. (3 Wall.) 713, 725, 18 L.Ed. 96 (1866) (stating that for the exercise of the commerce power, the navigable waters of the United States are to be deemed the "public property of the nation, and subject to all the requisite legislation by Congress").

We are not persuaded by the government's argument. It is true that the primary beneficial use of Maritrans' single hull tank barges has been in coastwise Jones Act trade. It is also true that it was OPA90's restriction on the use of those barges in that trade that precipitated Maritrans' suit. However, those facts do not somehow diminish or eliminate the basic property interest that Maritrans has in its single hull tank barges. Maritrans has various rights in its barges that qualify them as property for Fifth Amendment protection. For example, Maritrans may sell or otherwise dispose of the barges; it may possess and transport them; and it may alter them by adding a second hull. *See Andrus,* 444 U.S. at 66, 100 S.Ct. 318 (suggesting that the right to possess, transport, donate, devise, and sell are all "sticks" in the "bundle" of property rights).

Maritrans' interest in its tank barges is not unlike the interest that Paul Conti had in his swordfishing vessel, the F/V Providenza, and his swordfishing nets and gear in *Conti v. United States,* 291 F.3d 1334 (Fed.Cir.2002). Mr. Conti alleged that a ban on drift gillnet fishing in the Atlantic

Swordfish Fishery had deprived him of a particular use of his property. *Conti,* 291 F.3d at 1343. We split our analysis of Mr. Conti's takings claim between his swordfishing permit and his boat, nets, and gear. We found that, while Mr. Conti's permit did not constitute a cognizable property interest under the Fifth Amendment, his boat, nets, and gear did. *Id.* at 1342–43. In short, Maritrans' property interest in its barges was not compromised by the nature of its claim. Thus, the Court of Federal Claims did not err in holding that Maritrans had a cognizable property interest in its tank barges.

### B. *Categorical Taking*

 Having concluded that Maritrans has a cognizable property interest, we must determine whether the government interfered with that interest in a way that resulted in a compensable taking. In that regard, we consider first whether a categorical taking occurred. *See Rith Energy,* 247 F.3d at 1362. As noted above, a categorical taking is defined as one in which "all economically viable use, i.e., all economic value has been taken by the regulatory imposition." *Palm Beach Isles Assocs.,* 231 F.3d at 1357.

 The Supreme Court stated in *Lucas* that "total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation." *Lucas,* 505 U.S. at 1017, 112 S.Ct. 2886. The Court further stated that "regulations that leave the owner of land without economically beneficial or productive options for its use ... carry with them a heightened risk that private property is being pressed into some form of public service under the guise of mitigating serious public harm." *Id.* at 1018, 112 S.Ct. 2886. The Court concluded that "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in

the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Id.* at 1019, 112 S.Ct. 2886. Thus, in determining whether a categorical taking occurred in this case, we must decide whether Maritrans was called upon to sacrifice all economically beneficial uses of its single hull tank barges. In conducting our inquiry, we recognize that "the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored." *Rith Energy*, 247 F.3d at 1363 (quoting *Fla. Rock Indus., Inc. v. United States*, 791 F.2d 893, 905 (Fed.Cir.1986)).

In concluding that Maritrans had not suffered a categorical taking, the Court of Federal Claims considered the fact that Maritrans was able to use its barges for several years before OPA90 took effect and that it was able to sell, rebuild, or receive insurance proceeds from all of the vessels at issue. *Maritrans*, 51 Fed.Cl. at 281. The court therefore found that Maritrans had not been deprived of all economically beneficial use of its barges. *Id.* Maritrans argues, however, that it did suffer the loss of such use. It claims that there is no commercially viable use for the barges if they cannot carry oil, and that their scrap value is negligible. Under these circumstances, it contends, OPA90 resulted in a complete, 100% taking of the useful life of the barges for the periods of time that ensued after their various retirement dates under the statute. Maritrans argues that it was not able to obtain full pre-OPA90 value for the five barges that it sold, the Ocean 90, the Ocean 96, the Ocean 115, the Ocean 135, and the Ocean 155. It also argues that, on account of OPA90, it was not able to insure for its full value the Ocean 255 (the barge that was a casualty loss). As far as the Ocean 192 and the Ocean 244 (the two barges that were retrofitted with double hulls) are concerned, Maritrans contends that, when it rebuilt these vessels, the original single hull barges were destroyed and, in effect, it built and purchased two new double hull vessels.

Taking away a property's most beneficial use does not by itself constitute a compensable taking. *Andrus*, 444 U.S. at 65–66, 100 S.Ct. 318. In *Andrus*, the Court stated that "[a]t least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking." *Id.* Only where Congress takes away every beneficial use does a categorical taking occur. *Id.* In this case, OPA90 took away one strand of Maritrans' bundle of property rights by putting limitations on Maritrans' use of its single hull tank barges on the navigable waters of the United States. OPA90 did not deprive Maritrans of 100% of the beneficial uses of its barges, however. Maritrans used and received income from its barges from its shipping operations in Jones Act trade prior to the OPA90 retirement dates. Additionally, it was able to recoup substantial sums of its original investment in the eight barges at issue in this case. Maritrans was able to sell five of its single hull tank barges, the Ocean 90, the Ocean 96, the Ocean 115, the Ocean 135, and the Ocean 155, for nearly 100% of their original cost, and following the collision of the Ocean 255, it was able to recover insurance proceeds in the amount of $7.8 million. In addition, Congress left Maritrans with other options besides selling its vessels or collecting insurance proceeds. The statute contemplates that shipping companies, such as Maritrans, can retrofit their single hull vessels to double hull vessels and continue to operate in Jones Act trade after scheduled retirement dates. Maritrans took advantage of this option for two of its vessels and will be able to continue using them to transport oil. Although this option imposes substantial costs, Maritrans has not es-

tablished that retrofitting is not viable for any of its vessels. The fact that Maritrans' return on its investment may now be less than it originally expected is not enough to make Congress' enactment of OPA90 a compensable taking.

■■■ In urging that it experienced a categorical taking, Maritrans argues that the Court of Federal Claims erred in considering the entire timeframe during which Maritrans owned the tank barges alleged to have been taken. *See Maritrans*, 51 Fed.Cl. at 280. Maritrans claims that, instead, the court should have considered two separate periods, the period before and the period after the OPA90 retirement dates, and then looked at the impact in each period separately when it conducted its takings analysis. It asserts that, after the various retirement dates, all of the economic value of the vessels will be lost, and that, therefore, a categorical taking occurred.

We do not agree with Maritrans' argument. A similar situation presented itself in *Rith Energy*. There, the claimant urged us to isolate the commercial activity that took place after the revocation of its mining permit from the commercial activity that occurred before the revocation. We declined to do so.

> Rith argues that the permit revocation deprived it of all of its remaining property, i.e., 100 percent of the coal that

was left in the ground. We reject that argument.... As we explained in our initial opinion, it is artificial to divide the interests in the coal lease in the way that Rith proposes and to disregard the coal that had already been mined under the permit [before it was revoked].... The effect of the regulatory action in this case was to permit Rith to take some coal from the property that was the subject of its leases and then to prohibit it from taking any more. The course of regulatory action, viewed as a whole, did not deprive Rith of all the economic value in its coal leases and thus did not constitute a categorical taking of Rith's property.

*Rith Energy*, 270 F.3d at 1349–50.

We think that *Rith Energy* disposes of Maritrans' temporal argument. Just as the claimant in *Rith Energy* could not divide the term of its coal lease into two separate periods, one before and one after the governmental action allegedly effecting a taking, so here Maritrans may not confine the takings analysis for its tank barges to the various periods following the retirement dates mandated by OPA90 in order to argue that there were categorical takings during those periods.[6]

### C. Regulatory Taking

When a court determines that a categorical taking has not occurred, it must em-

6. *See Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). In *Tahoe–Sierra*, the Supreme Court considered two moratoria totaling 32 months that were imposed by the Tahoe Regional Planning Agency on development in the Lake Tahoe Basin. The petitioners argued that the moratoria constituted a taking under the categorical rule announced in *Lucas*, because the moratoria temporarily deprived them of all economically viable use of their land ("Petitioners seek to bring this case under the rule announced in *Lucas* by arguing that we can

effectively sever a 32 month segment from the remainder of each landowner's fee simple estate, and then ask whether that segment has been taken in its entirety by the moratoria." *Tahoe–Sierra*, 535 U.S. at 331, 122 S.Ct. 1465.). The Court rejected the argument, stating that the district court "erred when it disaggregated petitioners' property into temporal segments corresponding to the regulations at issue and then analyzed whether petitioners were deprived of all economically viable use during each period." *Id.* at 331, 122 S.Ct. 1465.

bark on a fact-based inquiry in which it applies the standard promulgated by the Supreme Court in *Penn Central* to evaluate whether the governmental action at issue nevertheless resulted in a regulatory taking. *Penn Cent.*, 438 U.S. at 124, 98 S.Ct. 2646 (stating that regulatory takings cases require "essentially ad hoc, factual inquiries"). The Supreme Court has provided guidance in this area of jurisprudence by setting forth the factors that we must consider when addressing a regulatory takings claim. As noted above, the Court has directed our attention to the character of the governmental action, the economic impact of the action on the claimant, and the extent to which the action has interfered with distinct, investment-backed expectations of the claimant. *Id.* at 124, 98 S.Ct. 2646; *see also Chancellor Manor v. United States*, 331 F.3d 891, 902 (Fed. Cir.2003) (quoting *Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1564 (Fed.Cir.1994) (stating that when a court conducts a regulatory takings analysis, it engages in a balancing of the *Penn Central* factors)).

The Court of Federal Claims held that OPA90 did not subject Maritrans' tank barges to a regulatory taking. *Maritrans*, 51 Fed.Cl. at 281. Although the court agreed with Maritrans that it had reasonable, investment-backed expectations when it acquired the barges at issue, it concluded that the governmental action embodied in OPA90 was for the public good and that the burden resulting from the action was not disproportionately placed on Maritrans. *Maritrans*, 43 Fed.Cl. at 89; *Maritrans*, 51 Fed.Cl. at 281–83. The Court of Federal Claims analyzed the government's action in the following manner:

> The double-hull requirement was intended to benefit the public. It is a burden for Maritrans, but it is not borne exclusively by Maritrans. Any vessel that carries oil in Jones Act trade must have a double hull beginning in 2005.

Although Congress placed new burdens on plaintiffs and others in the industry, it did not prohibit them from doing business.

*Maritrans*, 51 Fed.Cl. at 282.

■ The character of the governmental action factor requires a court to consider the purpose and importance of the public interest underlying a regulatory imposition, by obligating the court to "inquire into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented." *Creppel v. United States*, 41 F.3d 627, 631 (Fed.Cir.1994). "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government ... than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent.*, 438 U.S. at 124, 98 S.Ct. 2646.

■ OPA90 does not impose a physical invasion or restraint upon Maritrans' tank barges; nor does it compel the surrender of the barges. Rather, it imposes a significant precondition with respect to one use of the barges. In *Andrus*, the Supreme Court made clear that "the denial of one traditional property right does not always amount to a taking." *Andrus*, 444 U.S. at 65–66, 100 S.Ct. 318. Thus, in *Conti*, we rejected Mr. Conti's claim that his property was subjected to a regulatory taking by the 1999 ban on drift gillnet fishing in the Atlantic Swordfish Fishery. *Conti*, 291 F.3d at 1343. We held that, although the ban barred him from using his vessel, the F/V Providenza, and its gear for one particular purpose, harvesting swordfish using gillnets, the ban did not deprive him of all beneficial use of his property. *Id.* We agreed with the Court of Federal Claims that Mr. Conti could sell his vessel and its

gear, fish in a different fishery, or put the vessel to other uses. *Id.* at 1343–44.

Statutory and regulatory restrictions on property rights have been upheld by the Supreme Court if "the burdens they impose are not so wholly disproportionate to the burdens other individuals face in a highly regulated society that some people are being forced 'alone to bear public burdens which, in all fairness and justice, must be borne by the public as a whole....' " *United States v. Locke,* 471 U.S. 84, 107 n. 15, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985) (quoting *Armstrong,* 364 U.S. at 49, 80 S.Ct. 1563). Maritrans does not dispute that the government's interest in protecting the waterways of the United States from oil spills for environmental and navigational reasons is a permissible governmental goal. Rather, it asserts that OPA90 was passed for political reasons rather than out of environmental concerns. This argument is not persuasive.

Congress determined that implementation of a double hull requirement for vessels that carry oil in bulk on the navigable waters of the United States was necessary in order to reduce the likelihood of high volume spills that would result in damaging pollution. We will not reweigh the evidence Congress considered in making its determination that implementing a double hull requirement would avoid oil spills and thereby reduce pollution. *See Mugler v. Kansas,* 123 U.S. 623, 662, 8 S.Ct. 273, 31 L.Ed. 205 (1887) ("[I]f, in the judgment of the legislature, the manufacture of intoxicating liquors for the maker's own use, as a beverage, would tend to cripple, if it did not defeat, the effort to guard the community against the evils attending the excessive use of such liquors, it is not for the courts, upon their views as to what is best and safest for the community, to disregard the legislative determination of that question."). Moreover, Maritrans is not the sole marine petroleum transport com-

pany that is required to outfit its single hull tank vessels with double hulls. Congress created the restrictions in OPA90 to apply uniformly across the oil transport industry, thereby spreading the burden imposed by the statute over the entire industry. That Maritrans and other carriers in the industry benefit from transporting oil for profit in this case weighs in favor of allocating this burden to them, alone. At the same time, they pose the risk of the high-volume spills that Congress was seeking to eliminate when it enacted OPA90.

■ Maritrans attempts to draw an analogy between its situation and what happened in *Yancey v. United States,* 915 F.2d 1534 (Fed.Cir.1990). *Yancey* does not help Maritrans, however. In that case, during an outbreak of lethal Avarian Influenza, the United States Department of Agriculture imposed a quarantine on poultry in several geographic locations. As a result, the Yancys' birds were sold for slaughter despite the fact that testing showed they were not diseased. In *Yancey,* a Fifth Amendment taking was found because we determined that it would be unfair for the Yancys to bear the loss of their poultry stock when their birds did not pose the risk the government was attempting to eradicate. *Id.* at 1543. That is not the case here. Even assuming careful operation and maintenance, Maritrans' vessels pose the risk of oil spills that Congress was attempting to reduce. The reason is that Maritrans' tank barges, like other single hull vessels, are susceptible to possible collision and puncture. The result urged by Maritrans would have the effect of creating a disincentive for the government to enact publicly beneficial laws by requiring compensation every time a statute or regulation affects a property owner's interests. The purpose of the Just Compensation Clause is not to deter the

government from establishing regulations reasonably related to a publicly beneficial policy, but rather to discourage the government from requiring a few select individuals to bear the burdens of the public benefit. *Pa. Coal Co.*, 260 U.S. at 413, 43 S.Ct. 158 ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."). In this case, the Court of Federal Claims did not err in deciding that Maritrans was not unfairly forced to bear a burden that should be borne by the public. The character of the governmental action in this case weighs against Maritrans' takings claim.

■ When considering *Penn Central*'s economic impact factor, a court must "compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). The Court of Federal Claims calculated the change in fair market value of Maritrans' vessels caused by OPA90 by comparing the value of Maritrans' tank barges after OPA90 took effect with the value of the vessels before OPA90 took effect. *Maritrans*, 51 Fed.Cl. at 282. Using values provided by Maritrans, the court concluded that Maritrans' property declined in value by 13.1% due to OPA90. *Id.* at 283. The court concluded that this was not enough of a diminution in value to indicate that Maritrans was carrying an undue portion of the burden created by OPA90. *Id.* On appeal, Maritrans has not pointed to a different analysis of its own numbers, except to say that "it lost 100% of the useful life of its vessels after their OPA90 retirement dates." The evidence, upon which the Court of Federal Claims relied, suggests that Maritrans was able to regain a significant portion of its initial investment in the tank barges. In short, Maritrans has not shown that the court's

findings on economic impact are clearly erroneous. Thus, the degree of economic impact arising from OPA90's double hull requirement is a factor that also weighs against Maritrans' takings claim.

■ As far as reasonable, investment-backed expectations are concerned, Maritrans had to show that it acquired an interest in the tank barges "in reliance on a state of affairs that did not include the challenged regulatory regime." *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1177 (Fed.Cir.1994). Put another way, Maritrans had to show that it bought the barges "in reliance on the non-existence of [OPA90]." *Creppel*, 41 F.3d at 632. As noted, the Court of Federal Claims determined that Maritrans had made such a showing. *Maritrans*, 43 Fed. Cl. at 89.

The government argues that Maritrans entered into a highly regulated industry and that therefore any investment-backed expectation on its part was unreasonable. Maritrans counters that, absent OPA90, it would have been able to use its vessels for at least another sixty years and that it had no reason to believe that Congress would impose a double hull requirement. The Court of Federal Claims found that Maritrans reasonably believed that it would be able to use its single hull tank vessels for their entire working lives. *Id.* In making that finding, the court relied upon testimony from officials of the United States Coast Guard and from other individuals knowledgeable about the shipping industry. *Id.* at 88. Significantly, Coast Guard officials testified that, in 1980, the Coast Guard proposed a double hull requirement, but a National Academy of Sciences study completed in 1981 effectively ended all discussion of imposing it. As a result, the Coast Guard's proposal to require retrofitting of all vessels with double hulls was withdrawn in 1982. The government has

not shown that the Court of Federal Claims clearly erred in its finding of reasonable, investment-backed expectations on the part of Maritrans concerning its tank barge fleet.

Ultimately, however, the fact that Maritrans had a reasonable, investment-backed expectation in the non-imposition of a double hull requirement at the time it acquired its tank barge fleet does not help it. That is because the findings of the Court of Federal Claims with respect to the nature of the governmental action imposing the double hull requirement and with respect to the economic impact of the requirement on Maritrans—none of which Maritrans has shown to be clearly erroneous—fully support the court's holding that the double hull requirement of OPA90 did not result in a regulatory taking of the eight tank barges at issue in this case.

### III. Ripeness

The Court of Federal Claims concluded that, as far as vessels that had not been sold, retrofitted, or scrapped in reliance on OPA90 were concerned, Maritrans' takings claim was not ripe for adjudication. *Maritrans,* 43 Fed.Cl. at 92. The court reasoned that it could not "find a partial taking because nothing [had] been taken [at the time suit was filed]. Only economic value, not economically viable use, has been taken." *Id.* The court's ripeness ruling related to twenty-nine of the thirty-seven tank barges listed in Maritrans' complaint. However, as noted above, Maritrans has withdrawn its takings claim with respect to all but seven of these vessels, the Ocean 193, the Ocean 210, the Ocean 211, the Ocean 215, the Ocean 250, the Ocean Cities, and the Ocean States. Maritrans asserts that each of these vessels was taken at the time OPA90 was passed because the statute affected its value immediately. It requests that we reverse the Court of Federal Claims' March 11, 1999 decision and remand for addition-

al proceedings related to these seven vessels.

The "basic rationale" of the ripeness doctrine is "to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The roots of the doctrine "are found in both the Article III requirement of 'case or controversy' and prudential considerations favoring the orderly conduct of the administrative and judicial processes." *State Farm Mut. Auto. Ins. Co. v. Dole,* 802 F.2d 474, 479 (D.C.Cir.1986). In *Abbott Laboratories,* the Supreme Court established a two-part test for determining whether a case is ripe for adjudication. *Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. 1507. Under that test, a court is to focus on (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Id.* We review a ruling as to ripeness *de novo. Greenbrier v. United States,* 193 F.3d 1348, 1356 (Fed.Cir.1999).

In this case, the dates the affected vessels are set to retire are known from the text of OPA90. 46 U.S.C.App. § 3703a. No additional governmental action is required to determine when or if the retirements will take place. In other words, Congress built no amount of discretion into the OPA90 statutory scheme. Accordingly, the permissible uses of the vessels after each retirement date are known to a reasonable degree of certainty, i.e., no single hull tank barges may be operated on the navigable waters of the United States after their respective retirement dates. As such, under these circumstances, Maritrans' takings claim with respect to the Ocean 193, the Ocean 210, the Ocean 211, the Ocean 215, the Ocean 250, the Ocean Cities, and the Ocean States appears ripe for judicial review. In addi-

tion, assessing Maritrans' takings claim now would reduce the uncertainty and hardship to Maritrans of withholding court consideration.

In arguing that the Court of Federal Claims erred in its ripeness ruling, Maritrans relies on *National Advertising Co. v. Raleigh*, 947 F.2d 1158 (4th Cir.1991). In that case, the Fourth Circuit considered the timeliness of a suit of National Advertising Company ("National") challenging a 1983 ordinance of the City of Raleigh, North Carolina. The ordinance reduced the size of permissible off-premise advertising signs. The 1983 ordinance prohibited the construction of any new non-conforming signs. In addition, except for ordinary maintenance and poster panel replacements, the ordinance barred any structural alteration, reconstruction, or other material change to existing nonconforming signs unless the signs and their entire structures were brought into conformity with the 1983 ordinance. *Nat'l Adver. Co.*, 947 F.2d at 1161. Existing nonconforming signs were not immediately banned, however. Rather, under the ordinance, they were given a 5½ year grace period beginning October 23, 1983. *Id.* At the end of the grace period, non-conforming signs were required to be removed unless they fell within a specified state law exception. In its suit, National alleged that the 1983 ordinance resulted in a taking without just compensation, in violation of the Fifth Amendment, despite the fact that the ordinance contained a grace period. *Id.*

National filed its suit on April 28, 1989, more than three years after October 18, 1983, the date on which the sign ordinance was adopted, and approximately one month after expiration of the 5½ year grace period. The City of Raleigh moved to dismiss the suit as untimely based upon a North Carolina statute establishing a three-year statute of limitations period.

The district court granted the motion, and National appealed. *Id.* On appeal, National argued that the district court erred in holding that its cause of action accrued upon enactment of the ordinance in October of 1983. Instead, National contended, its cause of action did not accrue until either the expiration of the 5½ year grace period or, at the earliest, January 6, 1989, the date it received a notification letter from Raleigh demanding the removal of its nonconforming billboards by April 1989. *Id.* The appellate court rejected National's argument and affirmed the decision of the district court. *Id.* at 1163. The court held that National's cause of action accrued on October 23, 1983. *Id.* In so holding, the court stated that "[i]mmediately upon enactment, the 1983 ordinance interfered in a clear, concrete fashion with the property's primary use. Thus, on October 23, 1983, National's signs became 'nonconforming outdoor advertising signs.'" *Id.* The court further stated that, "[o]n that date, the useful lives of National's nonconforming signs were shortened from 30 years to 5½ years. Thus, the present value of the nonconforming signs was reduced accordingly." *Id.* at 1163–64.

This case presents circumstances not unlike those presented in *National Advertising Co.* Upon enactment, OPA90 interfered in a "clear, concrete fashion" with Maritrans' "primary use" of its tank barges, similar to the way in which Raleigh's 1983 ordinance interfered with National's primary use of its signs. Immediately, each vessel became subject to the requirement that, after the retirement dates set forth in OPA90, no single hull vessel to which Chapter 37 of Title 46 applies may be operated on the navigable waters of the United States. OPA90 interfered with Maritrans' primary use of its existing single hull tank barges by mandating that unless the barges were retrofitted to double hull configuration, they

could not be used to transport oil after the passage of an identified period of time. In addition, Maritrans suffered actual injury upon enactment of OPA90. At that time, the useful lives of its single hull tank barges were shortened from sixty years to between five and twenty-five years. Thus, the present values of the single hull tank barges were reduced accordingly. We thus conclude that the Court of Federal Claims erred in holding that it could not assess the impact of OPA90 with respect to tank barges that were not sold or retrofitted until their retirement dates had passed.

## CONCLUSION

We agree with the Court of Federal Claims that Maritrans has a cognizable property interest in its single hull tank barges. In addition, we affirm the court's decision that OPA90 did not result in either a categorical or a regulatory taking with respect to the Ocean 90, the Ocean 96, the Ocean 115, the Ocean 135, the Ocean 155, the Ocean 192, the Ocean 244, or the Ocean 255. The court's findings of fact are not clearly erroneous and its decision is otherwise free of legal error. We do, however, reverse the court's decision that Maritrans' takings claim with respect to the Ocean 193, the Ocean 210, the Ocean 211, the Ocean 215, the Ocean 250, the Ocean Cities, and the Ocean States is not ripe for adjudication. Maritrans' claim with respect to those barges meets the two-part test for ripeness that the Supreme Court set forth in *Abbott Laboratories*. As far as Maritrans' claim with respect to those barges is concerned, the case is remanded to the Court of Federal Claims for further proceedings as may be appropriate. On remand, the court and the parties will be guided by what we have said today in adjudicating Maritrans' appeal with respect to the Ocean 90, the Ocean 96, the Ocean 115, the Ocean 135,

the Ocean 155, the Ocean 192, the Ocean 244, and the Ocean 255.

AFFIRMED–IN–PART, REVERSED–IN–PART, AND REMANDED.

No costs.