# STATE OF MICHIGAN

# COURT OF APPEALS

DENISHIO JOHNSON,

        Plaintiff-Appellant,

and

THE AMERICAN CIVIL LIBERTIES UNION
OF MICHIGAN,

        Amicus Curiae,

v

CURT VANDERKOOI, ELLIOT BARGAS, and
CITY OF GRAND RAPIDS,

        Defendants-Appellees.

FOR PUBLICATION
May 23, 2017
9:00 a.m.

No. 330536
Kent Circuit Court
LC No. 14-007226-NO

Before: WILDER, P.J., and BOONSTRA and O'BRIEN, JJ.

BOONSTRA, J.

This case arises out of a police contact between plaintiff and City of Grand Rapids Police Department (GRPD) officers, and the application of what is described as GRPD's "photograph and print" (P&P) policy. The trial court granted summary disposition in favor of defendants under MCR 2.116(C)(7) and (10). Plaintiff appeals by right. We conclude that the trial court correctly held that defendants VanderKooi and Bargas were shielded by qualified immunity and were therefore entitled to summary disposition under MCR 2.116(C)(7), and that defendant City of Grand Rapids was entitled to summary disposition under MCR 2.116(C)(10) regarding plaintiff's claim for municipal liability under 42 USC § 1983. We therefore affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

On August 15, 2011, the GRPD received a telephone complaint that an individual eventually identified as plaintiff was walking through the Michigan Athletic Club's (MAC) parking lot in Grand Rapids and was looking into several vehicles as if intending to steal something from the vehicles. Officers Greg Edgcombe and Eugene Laudenslager responded and located plaintiff sitting under a shade tree. Plaintiff told Edgcombe that he had merely walked through the parking lot on his way to where he was sitting, to meet a friend who was taking the

-1-

bus. Plaintiff did not have identification with him. According to the police report completed by Edgcombe, numerous items had been stolen from vehicles in the MAC parking lot during the preceding months. The police report stated that some of the reports from the previous incidents contained "descriptions of [a] young black male suspect who left the area over the south parking lot grassy knoll which is directly in the path of where plaintiff lives on Burning Tree Drive." Edgcombe "file checked" his computer system for the name that plaintiff had given him (Denishio Johnson) and did not discover any warrants or previous arrests. Laudenslager spoke with a witness who identified plaintiff as the person who was looking into vehicles but who stated that plaintiff did not try to open or enter any of the vehicles.[1]

Sergeant Elliot Bargas of the GRPD arrived on the scene after Laudenslager and Edgcombe had made contact and spoken with plaintiff. According to Bargas, Edgcombe was in the process of trying to identify who plaintiff was and reported that plaintiff had told him that he was 15 years old and lived on Burning Tree Drive just south of the MAC parking lot. Bargas testified that plaintiff admitted to walking through the parking lot but denied looking into cars. Bargas further testified that plaintiff looked older than 15 years of age and had tattoos. Sergeant Bargas photographed plaintiff in case there were witnesses from the previous thefts who could identify a suspect. Sergeant Bargas also fingerprinted plaintiff because the GRPD had tried to obtain latent prints in the previous incidents. Bargas explained that at the time he performed the P&P on plaintiff, he and Edgcombe still were not sure about plaintiff's actual identity and were trying to verify it. Bargas testified that he asked plaintiff if there was someone he could call to come to the scene and confirm his identity. Sometime after the P&P, plaintiff's mother and another family member arrived. Bargas explained why plaintiff had been stopped (i.e., that two independent witnesses had described her son as looking into vehicles in the parking lot), and that plaintiff's mother verified his identity and indicated that she would make sure that plaintiff took a different route to avoid any future problems. Plaintiff left with his family.

In the meantime, Captain Curtis VanderKooi of the GRPD heard the radio traffic regarding the incident in the MAC parking lot, and went to the scene. VanderKooi testified that he believed he showed up after plaintiff had left and as things were wrapping up at the scene.[2] VanderKooi further testified that Bargas and Edgcombe explained what had occurred, that he approved of Bargas's actions, and that he then drove away. On the following day, VanderKooi requested that plaintiff's fingerprints be compared with any latent prints found at the scene of the other larcenies from vehicles in the area. According to VanderKooi, either there was no match

---

[1]Edgcombe's report states: "We discovered that [plaintiff] had looked into cars but unlike the initial information he had not tried to open or enter any of the vehicles that he looked into." It is not clear from the record what the phrase "initial information" refers to, as Edgcombe's description of the telephone complaint that prompted his response to the scene only indicates that the complainant described plaintiff as "looking into several cars as he passed by them in the lot as if looking to steal something if it presented it self [sic] to him."

[2] Bargas testified that he thought that VanderKooi arrived while plaintiff was stopped and before plaintiff's mother arrived.

between the prints or the quality of the prints was inadequate to make a comparison. VanderKooi took no further action related to this incident.

Plaintiff testified that he was handcuffed for the P&P procedure and was placed in the back of a police car for 5 to 10 minutes while waiting for his mother to arrive. Plaintiff denied looking into cars, but stated at his deposition that he usually looked at his reflection in car windows as he passed them. Plaintiff denied touching any vehicle. After the officers spoke with plaintiff's mother, they let plaintiff out of the police car and removed his handcuffs. Plaintiff testified that the police did not ask for his consent for the P&P or any search.

On August 7, 2014, plaintiff filed a complaint against Bargas, VanderKooi, and the City of Grand Rapids (the city), alleging violations of 42 USC 1981, 42 USC 1983, and 42 USC 1988. Plaintiff alleged that, without probable cause or legal authority, Bargas took fingerprints and photographs of plaintiff, who was African American. Plaintiff further alleged that the photographs were stored in the GRPD's files and that VanderKooi directed Bargas to take the fingerprints and photographs and to store them. Plaintiff also alleged that Bargas and VanderKooi took these actions against plaintiff because he was African American. In Count I, the complaint raised a claim against Bargas and VanderKooi under 42 USC 1981 and 42 USC 1983, and asserted that they had violated the Equal Protection Clause of the Fourteenth Amendment, US Const, Am XIV,[3] plaintiff's right to be free from unlawful searches and seizures under the Fourth Amendment, US Const, Am IV, his rights under the Fifth Amendment, US Const, Am V, barring the taking of private property without just compensation, and his constitutional right to privacy.

In Count II, plaintiff raised a municipal liability claim against the city under 42 USC 1988. According to the complaint, an analysis of police reports from March 2008 to March 2013 was conducted. The complaint alleged that, in the reports that contained VanderKooi's name and the phrase "P&P" or a similar reference to photograph and print, there were 11 people, including plaintiff, who were innocent of any wrongdoing but who had still had their photographs and prints taken, and an additional person who had only had a photograph taken. The complaint asserted that 75% of those individuals were African American, but the city's population was only 20% African American. The complaint alleged that plaintiff's photograph and prints were taken as part of the city's policy, which was enforced in a discriminatory manner.

On September 3, 2014, defendants filed their answer to the complaint and affirmative defenses. The following affirmative defenses were raised: (1) plaintiff failed to state a claim upon which relief could be granted; (2) the initial contact was a consensual police-citizen encounter; (3) reasonable suspicion supported the initial stop and the actions that followed; (4) the initial stop was reasonable; (5) the actions were not discriminatory or based on race; (6)

---

[3] The Fourteenth Amendment also provides the basis for claims that a state has denied other federal constitutional rights. See *Rendell-Baker v Kohn*, 457 US 830, 837-838; 102 S Ct 2764; 73 L Ed 2d 418 (1982).

Bargas and VanderKooi were entitled to qualified immunity; (7) plaintiff consented to some or all of defendants' actions; and (8) any claimed damages were caused, in whole or in part, by plaintiff's own actions.

On September 11, 2015, the city and the individual defendants filed separate motions for summary disposition. Bargas and VanderKooi argued that they were entitled to summary disposition under MCR 2.116(C)(7) because they were entitled to qualified immunity given that the law was not clearly established regarding taking fingerprints and photographs during investigatory stops. VanderKooi additionally argued that he was entitled to summary disposition under MCR 2.116(C)(10) because he did not have an active role in the stop. Moreover, Bargas and VanderKooi argued that they were entitled to summary disposition under MCR 2.116(C)(10) because there was no such thing as a constitutional right to privacy, plaintiff could not establish a takings claim, and plaintiff could not establish that he was discriminated against based on race.

The city argued that it was entitled to summary disposition under MCR 2.116(C)(10) because a city employee did not deny plaintiff a constitutional right, the city's P&P practice did not violate the Fourth Amendment, plaintiff could not establish that the city acted with deliberate indifference to the federal civil rights violations, and plaintiff could not establish a pattern, notice, or tacit approval of illegal conduct on the part of the city.

In response, plaintiff stated that he was abandoning his equal protection and § 1981 claims but denied that summary disposition was appropriate with respect to his remaining claims.

Plaintiff planned to have an expert witness, Dr. William Terrill, testify at trial. Dr. Terrill is a professor of criminal justice at Michigan State University. Dr. Terrill provided an affidavit in which he opined that Bargas's actions in performing the P&P procedure in this case were unreasonable. Defendants filed a joint motion to strike Dr. Terrill's proposed testimony. Defendants argued that Dr. Terrill's proposed testimony could be broken down into two categories: numerical opinions on racial profiling and opinions on whether Bargas's actions were reasonable. With respect to the numerical opinions on racial profiling, defendants argued that the opinion was inadmissible and unnecessary to the extent that it involved the ordinary use of computations that any layperson could perform. They further argued that Dr. Terrill was unqualified to testify about racial profiling. Moreover, defendants argued that Dr. Terrill's analysis was unreliable because it used unadjusted census data as a statistical benchmark—an approach rejected by many courts; that the analysis was unreliable because nothing was used as a control; that the analysis was unreliable because his "preliminary opinions" regarding this case were not developed using the same intellectual rigor as his academic work; and that the analysis involved inadmissible hearsay and was unnecessary for the jury to interpret the facts. Finally, defendants argued that Dr. Terrill's opinion contradicted the admissible evidence.

On October 30, 2015, the trial court held a hearing on the motions for summary disposition and the motion to strike. Defendants argued that there was no generalized constitutional right to privacy; that a right to privacy must be tied to a specific amendment; and that, in this case, the applicable amendment is the Fourth Amendment. Thus, defendants maintained that there could not be a separate claim under a general right to privacy and that the proper analysis is under the Fourth Amendment. Plaintiff did not dispute that analysis and agreed that his right to privacy should be evaluated in the context of the Fourth Amendment.

-4-

Defendants further argued that people did not have a reasonable expectation of privacy in their fingerprints or in photographs of themselves as they appeared in public. Plaintiff responded that either a search warrant or probable cause in the field was needed to gather the evidence and that "none of the bases that the Fourth Amendment requires" were present to allow the gathering of photographs and fingerprints in this case.

With respect to the Fifth Amendment, defendants argued that there are no property rights implicated in a person's photograph or fingerprints, that the photograph and fingerprints in this case were not published, and that the underlying incident was an application of police powers rather than a taking under the city's eminent domain power. Plaintiff argued that the incident involved a taking of intangible property without just compensation, although he conceded that there were certain instances when police could take someone's photograph and fingerprints as an appropriate exercise of police powers. Plaintiff also conceded that he could not find caselaw indicating that the taking of a fingerprint or photograph by police constituted a taking under the Fifth Amendment, but he maintained that it was an issue of first impression.

Following the hearing, the trial court issued two separate written opinions and orders regarding the motion to strike Dr. Terrill and the motions for summary disposition. With respect to the motion to strike, the trial court acknowledged Dr. Terrill's substantial training and education in the general field of criminal justice but questioned whether he was qualified to give an expert opinion in the instant case. The trial court held that, even assuming that Dr. Terrill was qualified in the area of police conduct similar to the instant case, plaintiff had failed to establish that Dr. Terrill's opinion would assist the trier of fact or that his opinions were based on a recognized form of specialized knowledge. The trial court therefore concluded that plaintiff had failed to satisfy the requirements of MRE 702. In addition, the trial court held that the testimony sought to be introduced did not pass muster under MRE 403 because the information—whether based on Dr. Terrill's statistical analysis or on non-statistical opinion—was unnecessary to assist the jury; plaintiff abandoned the equal protection claims based on race; and the statistical information would only confuse the issues presented to the jury. Accordingly, the trial court granted the motion to strike.

With respect to Bargas and VanderKooi's motion for summary disposition, the trial court noted that the complaint was limited to the P&P procedure and that plaintiff "did not challenge the propriety of the initial stop, search of his person, or detention." The trial court held that plaintiff "was in public and had no reasonable expectation of privacy in his various physical features which were readily observable by the public" and that the P&P did not violate the Fourth Amendment. In the alternative, the trial court noted that the Fourth Amendment only prohibited unreasonable searches and seizure, and it held that, even assuming that the P&P constituted a search and seizure, Bargas's actions were reasonable given the circumstances. Further, the trial court held that plaintiff did not establish that VanderKooi directed Bargas's actions. The trial court also rejected plaintiff's argument that he had a constitutional right to privacy in his fingerprints and facial features. The trial court therefore held that summary disposition was appropriate under MCR 2.116(C)(10) with respect to plaintiff's Fourth Amendment and constitutional right to privacy claim.

Regarding the Fifth Amendment claim, the trial court rejected plaintiff's argument and held that his facial features and fingerprints were "observable by the general public and not

protected under the common law right to privacy." It therefore held that summary disposition was appropriate under MCR 2.116(C)(10). The trial court also held that plaintiff had abandoned his equal protection claim under 42 USC 1981. Consequently, it held that summary disposition was appropriate under MCR 2.116(C)(10).

In addition, the trial court held that qualified immunity applied to all of plaintiff's claims against Bargas and VanderKooi. Therefore, the trial court concluded, "Because Plaintiff failed to establish a genuine issue of material fact regarding his 1983 claims, and abandoned his 1981 claim, and because Bargas and VanderKooi are otherwise shielded by qualified immunity, summary disposition is appropriate pursuant to MCR 2.116(C)(7) and 2.116(C)(10)."

With respect to the city's motion for summary disposition, the trial court held that plaintiff had failed to establish a violation of his constitutional rights and had not established that the policy was unconstitutional on its face or as applied; therefore, summary disposition was appropriate under MCR 2.116(C)(10).

The trial court accordingly dismissed plaintiff's claims with prejudice. This appeal followed.

## II. INDIVIDUAL DEFENDANTS

Plaintiff argues that the trial court erred by granting summary disposition in favor of Bargas and VanderKooi on his Fourth and Fifth Amendment claims. Because we find that Bargas and VanderKooi were shielded by the doctrine of qualified immunity, we disagree.

### A. STANDARD OF REVIEW

"A motion for summary disposition under MCR 2.116(C)(7) asserts that a claim is barred by immunity granted by law" and "may be supported or opposed by affidavits, depositions, admissions, or other documentary evidence; the substance or content of the supporting proofs must be admissible in evidence." *By Lo Oil Co v Dep't of Treasury*, 267 Mich App 19, 26; 703 NW2d 822 (2005). "A trial court properly grants a motion for summary disposition under MCR 2.116(C)(7) when the undisputed facts establish that the moving party is entitled to immunity granted by law." *Id*. We review de novo a trial court's grant of summary disposition pursuant to MCR 2.116(C)(7). *Fisher Sand & Gravel Co v Neal A Sweebe, Inc*, 494 Mich 543, 553; 837 NW2d 244 (2013). Further, we review de novo the question of whether a federal constitutional right was clearly established at the time of the alleged violation so as to preclude the protection of qualified immunity. See *Elder v Holloway*, 510 US 510, 516; 114 S Ct 1019, 1023; 127 L Ed 2d 344 (1994); *Morden v Grand Traverse Co*, 275 Mich App 325, 340; 738 NW2d 278 (2007).

### B. QUALIFIED IMMUNITY GENERALLY

"Qualified immunity is an established federal defense against claims for damages under § 1983 for alleged violations of federal rights." *Id*. A person is liable under 42 USC 1983 if he or she, "under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the

jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . ." 42 USC 1983. "Section 1983 itself is not the source of substantive rights; it merely provides a remedy for the violation of rights guaranteed by the federal constitution or federal statutes." *York*, 438 Mich at 757-758. "A cause of action under § 1983 is stated where a plaintiff shows (1) that the plaintiff was deprived of a federal right, and (2) that the defendant deprived the plaintiff of that right while acting under color of state law." *Davis*, 201 Mich App at 576-577. However, "[a] police officer may invoke the defense of qualified immunity to avoid the burden of standing trial when faced with a claim that the officer violated a person's constitutional rights." *Lavigne v Forshee*, 307 Mich App 530, 542; 861 NW2d 635 (2014).

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. at 542 (quotation marks and citations omitted). Thus, qualified immunity does not apply if a right was "clearly established" at the time of the violation, such that it "would be clear to a reasonable officer" that his or her conduct was unlawful. *Id*. (citations omitted).

Qualified immunity can apply "even if there were a genuine issue of material fact regarding the underlying [constitutional] claim." *Morden*, 275 Mich App at 340, 342. See also *Messerschmidt v Millender*, 565 US 535, 546; 132 S Ct 1235, 1244; 182 L Ed 2d 47 (2012) ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.") (quotation marks and citation omitted). In order for a right to be clearly established, there must be "binding precedent . . . that is directly on point." *Morden*, 275 Mich App at 340 (quotation marks and citation omitted; alteration in *Morden*).

In *Saucier v Katz*, 533 US 194, 201; 121 S Ct 2151; 150 L Ed 2d 272 (2001), the United States Supreme Court articulated the initial inquiry for determining whether qualified immunity applies: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" If there was no violation of a constitutional right, no further inquiry regarding qualified immunity is required. *Id*. However, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id*. "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Id*. at 202, quoting *Anderson v Creighton*, 483 US 635, 640; 107 S Ct 3034; 97 L Ed 2d 523 (1987). In other words, the "dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*.; see also *Anderson*, 483 US at 640 ("This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.") (citation omitted).

In *Pearson v Callahan*, 555 US 223, 231-232; 129 S Ct 808; 172 L Ed 2d 565 (2009), the Court clarified that courts may exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances

in the particular case at hand." *Id*. at 236. See also *Jones v Byrnes*, 585 F3d 971, 975 (CA 6, 2009) (explaining that "*Pearson* left in place [*Saucier's*] core analysis" and that it "need not decide whether a constitutional violation has occurred if we find that the officer's actions were nevertheless reasonable").

In this case, the circumstances lead us to conclude that the second prong of the *Saucier* analysis is dispositive of whether Bargas and VanderKooi are entitled to qualitative immunity. We therefore decline to address whether, taken in the light most favorable to plaintiff, the P&P procedure violated plaintiff's Fourth and Fifth Amendment rights. Rather, for the reasons stated below, we hold that at the time of the alleged violation, the right asserted by plaintiff was not clearly established. *Saucier*, 533 US at 201.

## C. FOURTH AMENDMENT RIGHTS

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. *People v Slaughter*, 489 Mich 302, 310-311; 803 NW2d 171 (2011). See also *Maryland v King*, ___ US ___, ___; 133 S Ct 1958, 1968; 186 L Ed 2d 1 (2013), quoting US Const, Am IV ("The Fourth Amendment, binding on the States by the Fourteenth Amendment, provides that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.' "). There is a dual inquiry for determining whether a search or a seizure is unreasonable: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v Ohio*, 392 US 1, 20; 88 S Ct 1868, 1879; 20 L Ed 2d 889 (1968).

A person is liable under 42 USC 1983 if he or she, "under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . ." 42 USC 1983. "Section 1983 itself is not the source of substantive rights; it merely provides a remedy for the violation of rights guaranteed by the federal constitution or federal statutes." *York v Detroit (After Remand)*, 438 Mich 744, 757-758; 475 NW2d 346 (1991). "A cause of action under § 1983 is stated where a plaintiff shows (1) that the plaintiff was deprived of a federal right, and (2) that the defendant deprived the plaintiff of that right while acting under color of state law." *Davis v Wayne Co Sheriff*, 201 Mich App 572, 576-577; 507 NW2d 751 (1993). It is undisputed that the officers were acting under the color of state law when the alleged Fourth Amendment violation of plaintiff's rights occurred.

## 1. NATURE OF PLAINTIFF'S CLAIMS

The factual allegations of plaintiff's complaint relate solely to the taking of plaintiff's photograph and fingerprints. Plaintiff did not challenge his initial stop, the length of his detainment, or the fact that he was handcuffed or placed in a police car, as being unreasonable and violative of his Fourth Amendment rights. Rather, he alleged only that the P&P procedure was an unlawful search and seizure. This Court must limit its review to the allegations contained in the complaint. See *Sutter v Ocwen L Servicing, LLC*, 499 Mich 874; 876 NW2d 244 (2016), see also *Steed v Covey*, 355 Mich 504, 511; 94 NW2d 864 (1959), quoting 41 Am Jur, Pleading,

§ 77, pp 343-345 (explaining the general principles that "[e]very material fact essential to the existence of the plaintiff's cause of action, and which he must prove to sustain his right of recovery, must be averred, in order to let in proof thereof" and that "[e]very issue must be founded upon some certain point, so that the parties may come prepared with their evidence and not be taken by surprise, and the jury may not be misled by the introduction of various matters").

The trial court did not abuse its discretion by limiting plaintiff's claims to those that plaintiff actually pled. The entirety of plaintiff's Count I (against Bargas and VanderKooi) reads as follows:

9. On August 25, 2011, Plaintiff Johnson was sitting on the grass approximately 150 south of Burton Street near the intersection of Breton Avenue in the City of Grand Rapids.

10. Plaintiff Johnson is an African-American.

11. Officer Greg Edgcombe contacted Plaintiff Johnson following a call from personnel at the Michigan Athletic Club ("MAC").

12. Despite being told that [plaintiff] had not tried to open or enter any of the vehicles in the MAC parking lot (unlike the initial information), Sgt. Elliott Bargas took a full set of fingerprints and two photos of [plaintiff], without probable cause, a search warrant or other legal authority to do so.

13. Upon information and belief, Defendant VanderKooi directed Sgt. Bargas to photograph Plaintiff Johnson and have the photograph stored in the files and records of the City of Grand Rapids Police Department, without probable cause, a search warrant, or legal authority to do so.

14. Upon information and belief, Defendant VanderKooi directed Sgt. Bargas to take Plaintiff Johnson's fingerprints and have the fingerprints stored in the files and records of the City of Grand Rapids Police Department, without probable cause, a search warrant, or legal authority to do so.

15. Defendants VanderKooi and Bargas took the above actions against Plaintiff Johnson, because he is an African-American.

16. At no time on August 15, 2011, did Plaintiff Johnson commit any offense in violation of the laws of the City of Grand Rapids, State of Michigan, or the United States.

17. There was no legal cause to justify the seizure of Plaintiff Johnson's photographic image and fingerprints.

18. The actions taken by Defendant Bargas and VanderKooi, were unreasonable and excessive.

19.   Plaintiff Johnson's constitutionally protected rights that Defendant Bargas and VanderKooi violated include the following:

    a.  His right to fair and equal treatment guaranteed and protected by the Equal Protection Clause of the Fourteenth Amendment.

    b.  His rights under the Fourth and Fourteenth Amendments to be free from unlawful search and seizure.

    c.  His rights under the Fifth Amendment which bars the taking of private property for public use without just compensation.

    d.  His right to privacy under the U.S. Constitution;

    e.  His rights protected by 42 U.S.C. § 1981 and 42 U.S.C. § 1983.

20.   As a direct and proximate result of Defendant's [sic] conduct, Plaintiff Johnson suffered a loss of freedom, emotional injury, including but not limited to fright, shock, embarrassment, and humiliation, and other constitutionally protected rights described above.

Although plaintiff now seeks to expand his claim to encompass a challenge to the length of his detention and his handcuffing, plaintiff's complaint itself reflects no such challenge. Moreover, the record reflects that the focal point of this litigation—from beginning to end—was not the duration of the stop or the handcuffing, but rather the P&P procedure. At the summary disposition hearing, for example, trial counsel argued:

And that's our point, is you have to be careful when you're going to take somebody's pictures or prints. . . .

* * *

So our contention is, no, there's no reasonable suspicion. There's no probable cause to suspect that Mr. Johnson has done anything, and you don't have the authority under the Fourth Amendment to take his photographs – plural – and take his full set of fingerprints.

The P&P procedure has continued to be the focal point on appeal. For example, plaintiff argues:

At the time of the encounter with Johnson, the law was clearly established regarding the fact that fingerprints could not be taken without probable cause and for that reason summary disposition on Johnson's Fourth Amendment claim was inappropriate.

* * *

This is a case where a person was subject to detention for the sole purpose of obtaining fingerprints, without probable cause. Such action violates the Fourth Amendment . . . .

-10-

* * *

Thus, it should be clear that the compulsory detention of Johnson in this case for the sole purpose of obtaining his fingerprints, without probable cause, violated the Fourth Amendment of the Constitution.

* * *

The issue in this case is the appropriateness of the taking of photographs and fingerprints of innocent people.[4]

Notwithstanding this focus, plaintiff cursorily asserts on appeal that the singular reference in paragraph 19(b) of his complaint to "[h]is rights under the Fourth and Fourteenth Amendments to be free from unlawful search and seizure" were adequate to place defendants on notice that he was challenging not only the P&P procedure, but the length of his detention and the fact that he was handcuffed.[5] We disagree.

While Michigan is a notice pleading state, *Johnson v QFD, Inc*, 292 Mich App 359, 368; 807 NW2d 719 (2011), a complaint must still provide reasonable notice to opposing parties. *Id.*; see also *Dacon v Transue*, 441 Mich 315, 329; 490 NW2d 369 (1992); MCR 2.111(B)(1). A defendant should not be left to "guess upon what grounds plaintiff believes recovery is justified" after reading the complaint. *Dacon*, 441 Mich at 329. Therefore, MCR 2.111(B)(1) requires that a theory of liability be supported by "specific allegations reasonably necessary to inform the adverse party" of the pleader's claims. *Id.* In this case, plaintiff provided specific allegations concerning the P&P procedure; however, the complaint is devoid of any allegations (much less specific ones) concerning the use of handcuffs or the length of plaintiff's detention. In fact, the complaint specifically alleges only that "[t]here was no legal cause to justify the seizure of Plaintiff Johnson's photographic image and fingerprints" and contains absolutely no allegations related to the seizure of plaintiff's person. The complaint's general allegation that the "unreasonable and excessive" actions taken by Bargas and VanderKooi resulted in a violation of his Fourth Amendment rights is the sort of general allegation that "gives no hint of the facts to

---

[4] *Amicus Curiae*, The American Civil Liberties Union of Michigan, confines its arguments in support of plaintiff to the P&P procedure.

[5] We note that on appeal plaintiff appears to challenge only the fact that his detention continued *after* officers on the scene spoke with witnesses and plaintiff himself. While plaintiff does not specify the precise length of time during which the detention was allegedly unreasonable, plaintiff testified at his deposition that he was interviewed by police, his fingerprint and picture were taken, and he was then handcuffed and allowed to call his mother. He further testified that 5 to 10 minutes elapsed from the time that he called his mother and her arrival, and that he was let out of the police car and handcuffs after his mother spoke with police. Bargas testified to a brief interaction with plaintiff's mother wherein she showed him her identification and identified plaintiff as her son.

-11-

which it refers." *Dacon*, 441 Mich at 329. It can therefore only be interpreted as referring back to the specific allegations that plaintiff did assert relative to the P&P procedure.

The trial court in this case did not abuse its discretion in declining to read plaintiff's general Fourth Amendment allegation as providing sufficient notice to defendants concerning any and all theories of liability that may have arisen from any portion of plaintiff's interaction with police—particularly where the complaint was devoid of *any* specific allegation concerning the unreasonableness of the seizure of defendant's person. *Id*. at 328. And because plaintiff never sought to amend his complaint to allege such a challenge, the trial court was not obliged to offer such an opportunity, and cannot be found to have committed plain error by failing *sua sponte* to do so. See *Kloain v Schwartz*, 272 Mich App 232, 242; 725 NW2d 671 (2006) (holding that the trial court was not required to *sua sponte* offer the plaintiff leave to amend his complaint absent a request for leave to amend or the defendants' written consent to amend).

For all of these reasons, we must confine our analysis of plaintiff's Fourth Amendment challenge and the issue of whether—for purposes of a qualified immunity analysis—plaintiff's alleged constitutional rights were clearly established, to the alleged unlawful search and seizure arising from the officers' use of the P&P procedure.

## 2. APPLICATION

"[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v United States*, 533 US 27, 33; 121 S Ct 2038, 2042; 150 L Ed 2d 94 (2001). See also *United States v Jacobsen*, 466 US 109, 113; 104 S Ct 1652, 1656; 80 L Ed 2d 85 (1984) ("A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed."). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz v United States*, 389 US 347, 351; 88 S Ct 507, 511; 19 L Ed 2d 576 (1967) (citations omitted).

When police obtain physical evidence from an individual, there are two different levels at which there might be a potential Fourth Amendment violation. *United States v Dionisio*, 410 US 1, 8; 93 S Ct 764, 769; 35 L Ed 2d 67 (1973). The first level involves the initial " 'seizure' of the 'person' necessary to bring him into contact with government agents," and the second level involves "the subsequent search for and seizure of the evidence." *Id*.

The United States Supreme Court has stopped short of deciding whether a brief detention of an individual for the purpose of fingerprinting, based on a reasonable suspicion (i.e., a *Terry* stop, *Terry*, 392 US at 20), is per se unreasonable. See *Davis v Mississippi*, 394 US 721, 722; 89 S Ct 1394, 1395; 22 L Ed 2d 676 (1969). In *Davis*, the Court explicitly stated that it was not deciding whether, during a criminal investigation, fingerprints could be obtained in the absence of probable cause. See *id*. at 728. ("We have no occasion in this case, however, to determine whether the requirements of the Fourth Amendment could be met by narrowly circumscribed procedures for obtaining, during the course of a criminal investigation, the fingerprints of individuals for whom there is no probable cause to arrest."). In fact, the Court stated that "[i]t is arguable, however, that, because of the unique nature of the fingerprinting process, such

detentions might, under narrowly defined circumstances, be found to comply with the Fourth Amendment even though there is no probable cause in the traditional sense." *Id*. at 727-728. The *Davis* Court ultimately decided the issue on the grounds that the petitioner's detention at the police headquarters "was not authorized by a judicial officer," that the "petitioner was unnecessarily required to undergo two fingerprinting sessions," and that the "petitioner was not merely fingerprinted during the [initial] detention but also subjected to interrogation." *Id*. at 728.

The conduct challenged in *Davis* thus occurred at the first level of Fourth Amendment analysis (i.e., the initial seizure of the petitioner's person necessary to bring him into contact with government agents), not the taking of the petitioner's fingerprints. See *Dionisio*, 410 US at 11 ("For in *Davis* it was the initial seizure—the lawless dragnet detention—that violated the Fourth and Fourteenth Amendments, not the taking of the fingerprints."). The *Dionisio* Court further stated that "*Davis* is plainly inapposite to a case where the initial restraint does not itself infringe the Fourth Amendment" *Id*. Further, in discussing whether the collection of a voice recording from a suspect required probable cause, the Court explained that a voice exemplar did not require intrusion into the body like a blood extraction, and it stated, "Rather, this is like the fingerprinting in *Davis*, where, though the initial dragnet detentions were constitutionally impermissible, we noted that the fingerprinting itself 'involves none of the probing into an individual's private life and thoughts that marks an interrogation or search.'" *Id*. at 14-15, quoting *Davis*, 394 US at 727. Therefore, "neither the summons to appear before the grand jury nor its directive to make a voice recording infringed upon any interest protected by the Fourth Amendment . . . ." *Dionisio*, 410 US at 15.

In *Hayes v Florida*, 470 US 811, 814; 105 S Ct 1643; 84 L Ed 2d 705 (1985), the Court concluded that there was no probable cause for the plaintiff to have been arrested, no consent, and no judicial authorization for detaining the defendant for fingerprinting purposes. Although the Court ultimately reversed the defendant's conviction, the reversal was based on the fact that, as in *Davis*, the defendant was forcibly removed from his home without probable cause or a warrant and transported to the police station for the purposes of fingerprinting him. *Id*. at 815-818. Notably, the Court stated, "None of the foregoing implies that a brief detention in the field for the purpose of fingerprinting, where there is only reasonable suspicion not amounting to probable cause, is necessarily impermissible under the Fourth Amendment." *Id*. at 816. The Court explained as follows:

> In addressing the reach of a *Terry* stop in *Adams v. Williams*, 407 U. S. 143, 146 (1972), we observed that "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." Also, just this Term, we concluded that if there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information. *United States v. Hensley, supra*, at 229, 232, 234. Cf. *United States v. Place*, 462 U. S. 696 (1983); *United States v. Martinez-Fuerte*, 428 U. S. 543 (1976); *United States v. Brignoni-Ponce*, 422 U. S. 873 (1975). There is thus support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the

-13-

suspect has committed a criminal act, if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch. Cf. *United States v. Place*, *supra*. Of course, neither reasonable suspicion nor probable cause would suffice to permit the officers to make a warrantless entry into a person's house for the purpose of obtaining fingerprint identification. *Payton v. New York*, 445 U. S. 573 (1980). [*Hayes*, 470 US at 816-817.]

In short, the United States Supreme Court has not definitively held whether fingerprinting someone constitutes a search under the Fourth Amendment. See *Maryland v King*, 569 US ___, ___; 133 S Ct 1958, 1987; 186 L Ed 2d 1 (2013) (SCALIA, J., dissenting); see also *Kaupp v Texas*, 538 US 626, 630 n 2; 123 S Ct 1843, 1846; 155 L Ed 2d 814 (2003). And the Court has suggested that fingerprints are a physical feature regularly exposed to the public. See, e.g., *Dionisio*, 410 US at 14-15. Various federal courts have relied on *Dionisio* in holding that photographing and fingerprinting does not constitute a search under the Fourth Amendment. See, e.g., *United States v Farias-Gonzalez*, 556 F3d 1181, 1188 (CA 11, 2009), citing *Dionisio*, 410 US 14-15 ("The police can obtain both photographs and fingerprints without conducting a search under the Fourth Amendment."); *Rowe v Burton*, 884 F Supp 1372, 1381 (D Alas, 1994), citing *Dionisio*, 410 US at 5-7 ("Courts have consistently refused to accord Fourth Amendment protection to non-testimonial evidence such as photographs of a person, his or her handwriting, and fingerprints. Thus, the photographs and fingerprinting, alone, would not likely constitute a search for purposes of the Fourth Amendment.") (citation omitted). And the Supreme Court has suggested that a brief seizure, based on reasonable suspicion, that includes the collection of information that is regularly exposed to the public, could be permissible. *Hayes*, 470 US at 816-817; see also *Dionisio*, 410 US at 14 (explaining that "[n]o person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world").

Further, although the case did not involve police contact, this Court has also held that "[t]here is no reasonable expectation of privacy in one's fingerprints." *Nuriel v Young Women's Christian Ass'n of Metro Detroit*, 186 Mich App 141, 146; 463 NW2d 206 (1990); see also *People v Hulsey*, 176 Mich App 566, 569; 440 NW2d 59 (1989), citing *Dionisio*, 410 US 14-15. Also, photographing a person as they appear in public does not generally violate any reasonable expectation of privacy. *Sponick v Detroit Police Dept*, 49 Mich App 162, 198-199; 211 NW2d 674 (1973); *Fry v Ionia Sentinel-Standard*, 101 Mich App 725, 728-729; 300 NW2d 687 (1980); see also 3 Restatement Torts 2d, § 652d.

It is therefore not clearly established in the law that fingerprinting and photographing someone during the course of an otherwise valid investigatory stop violates the Fourth Amendment. In fact, prior statements from the United States Supreme Court and this Court suggest that such a procedure would be permissible under the Fourth Amendment if the initial stop was justified by a reasonable suspicion. We therefore conclude that Bargas and VanderKooi were entitled to the protection of qualified immunity regarding defendant's Fourth Amendment claims.

## D. FIFTH AMENDMENT RIGHTS

In relevant part, the Fifth Amendment of the United States Constitution provides as follows:

No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation. [US Const, Am V.]

The Fifth Amendment is applicable "to the states through the Fourteenth Amendment, US Const, Am XIV." *AFT Mich v Michigan*, 497 Mich 197, 217; 866 NW2d 782 (2015). A " 'taking' can encompass governmental interference with rights to both tangible and intangible property," and "[t]he term 'property' encompasses everything over which a person may have exclusive control or dominion." *Id*. at 216, 218 (quotation marks and citation omitted). "In order to prevail on a takings claim, a claimant first must demonstrate a cognizable interest in the affected private property." *Mich Soft Drink Ass'n v Dep't of Treasury*, 206 Mich App 392, 402; 522 NW2d 643 (1994), lv den 448 Mich 898 (1995). "The Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment." *Maritrans Inc v United States*, 342 F3d 1344, 1352 (CA Fed, 2003). Rather, "existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." *Id*. (quotation marks and citation omitted).

Plaintiff argued before the trial court that the P&P procedure constituted an unlawful taking of his "image or likeness" without just compensation. This Court and the Michigan Supreme Court have recognized a common-law right of privacy that protects against various types of invasions of privacy including the "[a]ppropriation, for the defendant's advantage, of the plaintiff's name or likeness." *Battaglieri v Mackinac Ctr For Pub Policy*, 261 Mich App 296, 300; 680 NW2d 915 (2004), quoting *Tobin v Mich Civil Serv Comm*, 416 Mich 661; 331 NW2d 184 (1982) (quotation marks and emphasis omitted). Yet, "causes of action for violations of such a right stem from 'the interest of the individual in the exclusive use of his own identity, in so far as it is represented by his name or likeness, and in so far as the use may be of benefit to him or to others.' " *Id*. at 261 Mich App at 300–301, quoting 3 Restatement Torts, 2d, § 652C, comment a. Therefore, a person's likeness and identity "in so far as the use may be of benefit to him or to others" amounts to "property." See *AFT Mich*, 497 Mich at 216. "To generate a compensable taking, the government must assert its authority to seize title or impair the value of property." *Id*. at 218.

In this case, plaintiff made no argument that the value of his likeness was impaired or that any defendant seized title to his likeness. Defendants did not interfere with plaintiff's ability to use his identity or likeness to benefit plaintiff or others and did not prevent plaintiff from carrying out any future endeavors to benefit from his likeness. In addition, plaintiff's photographs and fingerprints were obtained under the police power rather than power of eminent domain. See *Bennis v Michigan*, 516 US 442, 452; 116 S Ct 994, 1001; 134 L Ed 2d 68 (1996) ("The government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain."). Plaintiff's counsel admitted to uncovering no caselaw stating that police conduct in

photographing and fingerprinting person for investigatory purposes constituted a governmental taking. Thus, Bargas and VanderKooi were entitled to the protection of qualified immunity with respect to plaintiff's Fifth Amendment claims.

## E. CONCLUSION

The alleged constitutional infirmities of the P&P procedure and the rights asserted by plaintiff were not clearly established in view of the preexisting law. See *White v Pauly*, ___ US ___, ___; 137 S Ct 548, 552; 196 L Ed 2d 463 (2017) ("As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case. Otherwise, [p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.") (quotation marks and citation omitted; alterations in *White*). Bargas and VanderKooi were therefore entitled to the protection of qualified immunity and to summary disposition under MCR 2.116(C)(7).[6]

## III. MUNICIPAL DEFENDANT

Plaintiff also argues that the trial court erred by granting summary disposition in favor of the city on plaintiff's claim for municipal liability. We disagree.

We review de novo a trial court's grant of summary disposition. See *Innovation Ventures v Liquid Mfg*, 499 Mich 491, 506; 885 NW2d 861 (2016). The trial court granted the city's motion for summary disposition under MCR 2.116(C)(10); therefore, the following standards apply:

> A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. When evaluating a motion for summary disposition under MCR 2.116(C)(10), a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties . . . in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [*Id.* at 507 (quotation marks and citation omitted; alteration in original).]

"A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). Moreover,

---

[6] We note also that there was no evidence presented to the trial court that VanderKooi participated in the P&P of plaintiff or ordered Bargas to perform the P&P. To the contrary, Bargas testified at his deposition that it was his decision to perform the P&P. Consequently, even apart from the application of qualified immunity, the evidence presented to the trial court would not support plaintiff's claim against VanderKooi, and VanderKooi would be entitled to summary disposition under MCR 2.116(C)(10).

-16-

When a motion under subrule (C)(10) is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, judgment, if appropriate, shall be entered against him or her. [MCR 2.116(G)(4).]

Under 42 USC § 1983, a municipality may be held liable for unconstitutional policies, but § 1983 does not provide for respondeat superior liability. *Payton v Detroit*, 211 Mich App 375, 398; 536 NW2d 233 (1995). Accordingly, "[a] municipality cannot be held liable under § 1983 solely because it employs a tortfeasor, and, "in order to sustain a cause of action against a municipality under § 1983, a plaintiff must show that an action pursuant to official municipal policy of some nature caused a constitutional tort." *Id*. (quotation marks and citation omitted). In order for a municipality to be liable, a plaintiff must show that an official municipal policy or custom caused his injury. *Connick v Thompson*, 563 US 51, 60–61; 131 S Ct 1350, 1359; 179 L Ed 2d 417 (2011); *Los Angeles Co, Cal v Humphries*, 562 US 29, 30-31, 36; 131 S Ct 447, 449, 452; 178 L Ed 2d 460 (2010). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 at US 61.

In this case, plaintiff argues that the city has a policy of requiring P&Ps of "innocent pedestrians who do not happen to have ID on them." In support of this contention, plaintiff alleges that VanderKooi was involved in eleven incidents over five years where persons "innocent of any wrongdoing," including plaintiff, were subject to the P&P procedure, and another incident where a person was only photographed. The following pieces of documentary evidence submitted to the trial court make reference to this alleged policy or custom:

1. The city's answer to a request for admission, in which the city stated in relevant part:

[O]fficers taking photos and thumbprints of individuals is a custom or practice of the City of Grand Rapids and has been for decades. The custom or practice has changed over those years with the evolution of technology. . . . [A]lthough it is primarily a thumbprint, another finger or fingers might be printed instead of or in addition to a thumb. . . . A photograph and print might be taken of an individual when the individual does not have identification on them and the officer is in the course of writing a civil infraction or appearance ticket. A photograph and print might be taken in the course of a field interrogation or a stop if appropriate based on the facts and circumstance of that incident.

2. Bargas's deposition testimony, in which he agreed that he performed the P&P procedure in accordance with departmental policy.

3. VanderKooi's deposition testimony, in which the following colloquy occurred between VanderKooi and plaintiff's counsel:

*Q*. Okay. So, you would agree with the statement that police officers taking photographs and thumbprints known as P and P of individuals with whom

-17-

they made contact is a commonly known longstanding custom and practice of the Grand Rapids Police Department?

    *A*. When I started in 1980 they were doing P and P's yes.

4. An excerpt from the Grand Rapids Police Manual of Procedures (dated 2004) that contain the following statements relevant to the P&P procedure:

    3. Officers issuing appearance tickets shall:

        * * *

    b. Picture and print all subjects without good identification.

5. An excerpt from the Grand Rapids Police Department Field Training Manual (dated 2009) that contains the following statements relevant to the P&P procedure:

    Under the heading **FIELD INTERROGATIONS**:

    5. Field Interrogation reports

        * * *

    d. Disposition of suspect (arrest, picture and print, released, etc).

    B. TRAINING CONSIDERATIONS

        * * *

    9. Picture and print procedures.

6. An excerpt from the same Field Training manual related to traffic violations that lists the actions an officer may take when a motorist is driving with their driver's license suspended, revoked, or denied and states in relevant part:

    (3) Issue citation and obtain a picture and print or arrest.

7. An excerpt from the Grand Rapids Police Department Patrol Sergeant Field Training Tasks Manual (which we note indicates that it was revised in 2013, after the incident in question) that provides in relevant part:

    <u>**TRAFFIC/ACCIDENT PROCEDURES**</u>

        * * *

    3)      Picture and Prints.

    a) Carry a Digital Camera and related supplies.

-18-

b) Photograph subject clearly and take a readable thumbprint.

> (1) Record on P&P card, Subject Identifier (name, race, sex, etc). Include License Plate in picture if driver or occupant of vehicle.

We conclude that this evidence does not suffice to show that any alleged violation of plaintiff's constitutional rights was the result of an official municipal policy or custom. Plaintiff argues in his brief on appeal that the trial court erred when it failed "to recognize that the custom and practice that [plaintiff] challenges is not the taking of prints and pictures, generally, but the custom and practice of taking prints and pictures of innocent citizens," specifically the P&P of persons taken in the course of a field interrogation or stop. However, the documentation relied upon by plaintiff does not indicate that the city has a policy of requiring P&Ps during field interrogations and stops. The only references to P&P with respect to field interrogations and stops, as opposed to the writing of "appearance tickets" or citations for driving with a suspended, revoked, or denied driver's license, are found in the guidelines for describing the disposition of the subject in the field interrogation report and the reference to "training considerations" in the Field Training Manual. Nothing about these references instruct GRPD officers to take P&Ps during every field interrogation or stop or every such encounter where the subject lacks official identification or to P&P "innocent citizens." In fact, the majority of the references to the use of the P&P procedures involve its use during the issuance of citations that do not result in arrest; the issuance of these citations would involve, absent bad faith on the part of the issuing officer, at least a good-faith belief that probable cause existed to suspect that an ordinance or statute was violated. See MCL 257.727c; MCL 764.1d; MCL 764.9f; *Detroit v Recorder's Court Judge, Traffic and Ordinance Div*, 85 Mich App 284, 292; 271 NW2d 202 (1978). Further, the Patrol Sergeant Field Training Tasks Manual, to the extent it is even relevant to events that occurred before its revision date, discusses P&Ps not in the context of field interrogations or stops, but rather in the section labelled "TRAFFIC/ACCIDENT PROCEDURES".

We conclude that the action that plaintiff alleges to have caused the deprivation of his rights, i.e., a P&P during a field interrogation or stop, did not "implement[] or execute[] a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the city, whether through GRPD or otherwise. *Monell*, 436 US at 690. We also conclude that, even viewing the evidence in the light most favorable to plaintiff, see *Innovation Ventures*, 499 Mich at 507, plaintiff did not establish a genuine issue of material fact that his alleged deprivation was caused by an unwritten custom or policy "so persistent and widespread as to practically have the force of law." *Connick*, 563 at US 61.

Contrary to plaintiff's contention, the city has not admitted that plaintiff was subjected to a P&P as a result of a custom or policy. The city did admit that the P&P procedure in general exists and did use the words "custom or practice." However, the city also stated that a P&P was discretionary and dependent on the particular facts of the incident in question: "A photograph and print might be taken in the course of a field interrogation or a stop if appropriate based on the facts and circumstance of that incident." Further, Bargas's deposition testimony, read in context, indicates that he agreed that his taking of plaintiff's photograph and fingerprints was "in keeping" with departmental policy; Bargas also testified that he made the decision to P&P plaintiff based on the particular circumstances of the case, specifically that he did not believe

plaintiff's claim of identity (apparently based at least in part on Bargas's belief that plaintiff could not have received a tattoo in Grand Rapids if he was under 18), the fact that previous burglaries from cars had been reported in that parking lot, and his belief that latent prints had been taken from the previous burglaries that could either support the conclusion that plaintiff was a suspect in the burglaries or eliminate him as a suspect. Nothing in Bargas's testimony indicates that he was following a custom or policy that had the force of law when he performed a P&P on plaintiff. And VanderKooi's testimony similarly reveals his individualized choices to perform P&Ps or to order them performed in the cases identified by plaintiff.[7]

"Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd of Co Comm'rs of Bryan Co, Oklahoma*, 520 US 397, 405; 117 S Ct 1382; 137 L Ed 2d 626 (1997). In this case, even assuming that plaintiff could demonstrate a violation of his rights, plaintiff cannot show that the city "specifically directed" Bargas to violate plaintiff's rights. *Id*. at 406. Not every constitutional violation by an officer in the field supports a finding of municipal liability for his employer; "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 US at 693. We therefore conclude that plaintiff failed to raise a genuine issue of material fact concerning whether Bargas's action was taken "under color of some official policy" whether written or unwritten, when the most that can be gleaned from the evidence presented to the trial court was that the P&P procedure was available for use by GRPD officers and could, depending on particularized circumstances, be used during the field interrogation of a person who was never arrested or charged with a crime. The trial court properly granted summary disposition in favor of the city under MCR 2.116(C)(10).

## IV. PLAINTIFF'S EXPERT WITNESS

Finally, plaintiff argues that the trial court erred by granting defendants' motion to strike Dr. Terrill's testimony. We disagree. We review for an abuse of discretion a trial court's determinations regarding "[w]hether a witness is qualified to render an expert opinion and the actual admissibility of the expert's testimony." *Tate ex rel Estate of Hall v Detroit Receiving Hosp*, 249 Mich App 212, 215; 642 NW2d 346 (2002). "A trial court does not abuse its discretion when its decision falls within the range of principled outcomes." *Rock v Crocker*, 499 Mich 247, 260; 884 NW2d 227 (2016).

---

[7] As stated above, VanderKooi did not order Bargas to perform the P&P. Nor did VanderKooi's testimony support the inference that Bargas was acting according to the policy alleged by plaintiff, as VanderKooi testified to his belief that Bargas had "consensually obtained" plaintiff's fingerprints.

MRE 702 governs expert testimony and provides as follows:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MRE 702 "requires the circuit court to ensure that each aspect of an expert witness's testimony, including the underlying data and methodology, is reliable," and it "incorporates the standards of reliability that the United States Supreme Court articulated in *Daubert v Merrell Dow Pharm, Inc*," 509 US 579, 113 S Ct 2786, 125 L Ed 2d 469 (1993). *Elher v Misra*, 499 Mich 11, 22; 878 NW2d 790 (2016). *Daubert* requires that the trial court ensure all scientific testimony is relevant and reliable. *Id*. at 22-23. Although not dispositive, absence of supporting literature "is an important factor in determining the admissibility of expert witness testimony." *Id*. at 23. Notably, "it is generally not sufficient to simply point to an expert's experience and background to argue that the expert's opinion is reliable and, therefore, admissible." *Id*. (quotation marks and citation omitted).

In *Kumho Tire Co, Ltd v Carmichael*, 526 US 137, 152; 119 S Ct 1167, 1176; 143 L Ed 2d 238 (1999), the United States Supreme Court held that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." In other words, *Daubert*'s general gatekeeping function applies to all expert testimony—whether the expert relies on scientific principles or "skill- or experience-based observation." *Id*. at 151-152. However, "[t]he trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether or not* that expert's relevant testimony is reliable." *Id*. at 152. "[W]hether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id*. at 153.

The trial court did not abuse its discretion in striking Dr. Terrill's proposed expert testimony concerning the reasonableness of Bargas's actions in the instant case. Plaintiff cites to numerous cases in support of his argument that expert testimony can be used to "educate the trier of fact on police methods and procedures, patterns of expected police response to given situations, and whether those are legal or illegal." However, none of these cases stand for the proposition that expert testimony that invades the province of the jury by making a legal conclusion is permissible. "The opinion of an expert may not extend to the creation of new legal definitions and standards and to legal conclusions." *Lenawee Co v Wagley*, 301 Mich App 134, 160-161; 836 NW2d 193 (2013). Expert witnesses may not invade the province of the jury and are "not permitted to tell the jury how to decide the case." *Carson Fischer Potts & Hyman v Hyman*, 220 Mich App 116, 122-123; 559 NW2d 54 (1996).

In this case, Dr. Terrill's opinion that Bargas's conduct was unreasonable was a legal conclusion based on Terrill's own interpretation of the same facts that a jury would be tasked with interpreting. See *DeMerrell v Cheboygan*, 206 Fed Appx 418, 426-427 (CA 6, 2006) (holding that "Plaintiff–Appellant's expert testified as to a legal conclusion because he stated that "it was objectively unreasonable for Officer White to shoot Mr. DeMerrell" and that the expert made the following other improper legal conclusions: (1) "a reasonable officer on the scene would not have concluded at the time that there existed probable cause that Mr. DeMerrell posed a significant threat of death or serious physical injury to the officer or others" and (2) "use of deadly force by [Officer White] was improper and unnecessary"); *Hygh v Jacobs*, 961 F2d 359, 364 (CA 2, 1992) (comparing expert testimony that a police officer's "conduct was not 'justified under the circumstances,' not 'warranted under the circumstances,' and 'totally improper' " to improper expert testimony that a person was negligent and holding that the expert "testimony regarding the ultimate legal conclusion entrusted to the jury crossed the line and should have been excluded").[8]

Further, although plaintiff does not present argument on this issue, much of Dr. Terrill's testimony related to plaintiff's abandoned equal protection claim and was therefore not relevant to the issues at hand. MRE 401. The trial court did not abuse its discretion in striking Dr. Terrill's testimony. Further, even if Dr. Terrill's testimony was stricken in error, nothing in his testimony would alter our conclusions in Parts II and III, above. Any error in the trial court's granting of defendants' motion to strike was therefore harmless. See *Lewis v LeGrow*, 258 Mich App 175, 200; 670 NW2d 675 (2003); MCR 2.613(A).

Affirmed.

/s/ Mark T. Boonstra
/s/ Colleen A. O'Brien

Wilder, P.J., did not participate.

---

[8]Lower federal court decisions "are not binding on state courts" but may be persuasive. *Bienenstock & Assoc, Inc v Lowry*, 314 Mich App 508, 515; 887 NW2d 237 (2016) (quotation marks and citation omitted).